**CAPE HENRY BIRD CLUB et al.,**
Plaintiffs,

v.

**Melvin R. LAIRD et al.,**
Defendants.

**Civ. A. No. 73-C-9-R.**

United States District Court,
W. D. Virginia,
Roanoke Division.

April 2, 1973.

Gladys Kessler, Berlin, Roisman & Kessler, Washington, D. C., Stanley E. Sacks, Girard C. Larkin, Jr., Sacks, Sacks & Tavss, Norfolk, Va., and Holman Willis, Jr., Roanoke, Va., for plaintiffs.

Paul R. Thomson, Jr., Asst. U. S. Atty., Roanoke, Va., Irwin Schroeder, U. S. Dept. of Justice, Washington, D. C., and Gary L. Bohlke, Corps of Engineers, Washington, D. C., for U. S. and others, defendants.

William T. Wilson, Collins & Wilson, Covington, Va., for Covington-Alleghany County Chamber of Commerce and James River Basin, defendant-intervenors.

Clarence W. Allison, Jr., Commonwealth Atty., Covington, Va., for Bd. of Supervisors of Alleghany County, defendant-intervenor.

William Carson, City Atty., Covington, Va., for City of Covington, defendant-intervenor.

James R. Saul, Asst. City Atty., Richmond, Va., for City of Richmond, defendant-intervenor.

C. Shepherd Nowlin, City Atty., Lynchburg, Va., for City of Lynchburg, defendant-intervenor.

William Goode, City Atty., Clifton Forge, Va., for City of Clifton Forge, defendant-intervenor.

Erwin S. Solomon, Commonwealth Atty., Hot Springs, Va., for Bd. of Supervisors of Bath County, defendant-intervenor.

OPINION and JUDGMENT

DALTON, Chief Judge.

## INTRODUCTION

This case represents a relatively new and growing subject of court litigation relating to the effects of man's projects upon his environment. In this instance it concerns the construction of the Gathright Dam which is being built on the Jackson River in Alleghany and Bath Counties, Virginia. The original plaintiffs and all plaintiff-intervenors have asked this court to grant a permanent injunction against any further construction on the dam.

The Congress of the United States has, on previous occasions, considered the Gathright project. Beginning with its initial authorization by the Flood Control Act of 1946, the project has over the years received the attention of our elected representatives. By reason of various delays, the project was not begun in earnest until 1963 when funds for advanced engineering and design were authorized. Land acquisition began in 1967, and actual construction was started in 1968. The project, expected to cost approximately $47 million dollars, is currently about 30% complete. It is intended to provide for flood control, water quality control, and recreation.

## THE PROJECT

The dam itself will be constructed of earth and rock-fill and will be 257 feet in height. It will create a lake which will remove about twelve miles of the Jackson as a free-flowing river. Current plans call for the lake created by the dam to be maintained at an elevation of 155 feet. This level is the maximum height to which the lake will reach. As water is needed downstream to augment the low flow periods of the Jackson River, more water will be released from the lake to restore the river to its normal flow. The minimum height to which the lake is to be drawn down is 127 feet

above the river bed, thus maintaining the lake level between 127 feet and 155 feet above the river bed.

During flood stages a flood control pool, the maximum height of which will be 183 feet, will be provided for above the 155 foot level. In addition an emergency spillway, located at level 240 feet, will provide added protection to the dam in the event that flood waters rise appreciably above the 183 foot level. After a flood period subsides, the waters stored above the 155 foot level will be gradually released until the level of 155 feet is reached.

As currently designed, the lake at level 127 feet will cover 1,780 acres and will store 63,000 acre-feet water. At its maximum the lake will cover 2,530 acres and provide storage for 123,700 acre-feet of water. Based upon past history, the maximum surface area of the flood control pool at elevation 183 feet will be 3,160 acres and contain 203,600 acre-feet of water.

A large portion of the area acquired was originally part of the T. M. Gathright Wildlife Management Area which was owned privately until purchased by the Commonwealth of Virginia in 1958. Approximately 10% of the land to be acquired by the federal government is cropland and pasture, the remaining portion being woodland and forest. Under the auspices of Virginia's Commission of Game and Inland Fisheries, the area is quite productive in wildlife, particularly wild turkey and deer. While the river supports several species of fresh water fish, it does not sustain the trout fishing pressure and is therefore periodically stocked with trout by the Commission. Other activities for which the area is used are hiking, swimming, picnicking and camping.

One of the principal purposes of the dam will be flood control. The Jackson River watershed has been subjected to fourteen floods within the 59 year period from 1913 to 1972. As determined by the Army Corps of Engineers, bankfull capacity occurs when the river is flowing at a rate of approximately 13,000 c. f. s. (cubic feet per second). During this 59 year interval, twelve floods have exceeded 14,000 c. f. s., four of which have occurred within the past ten years—1963, 1967, 1969 and 1972. The Corps contends that the dam will have significant flood control effect in the Covington and Clifton Forge area, with effects downstream to Lynchburg. Beyond this point, the dam will provide decreasing flood control benefits which, when Richmond is reached, will be minimal.

A second reason for the dam's construction is water quality control, which is perhaps the most controversial issue in this case. During several months of the year the Jackson River's flow decreases substantially, sometimes to the point where much of the river bed is exposed. To alleviate this problem, the Corps proposes that water stored behind the dam will be released as needed to augment the flow of the river. Augmentation will continue when necessary until the minimum level of the lake is reached, at which time it will cease.

Based upon the Corps' historical data for the recreation season, extending from May 1 through October 31, there will be no need for low flow augmentation during a wet season. In an average year some drawdown will occur. According to past averages drawdown will begin near the end of June and continue on through to the end of the recreation season. It is contended that during these periods the lake would not fall more than 12 feet. During a normal year the lake would vary between 153 feet and 155 feet. The Corps contemplates that during a dry season there would be complete drawdown by the end of October.

The Corps has computed that complete drawdown will occur once in every seventy years; a drawdown of 10 feet can be expected once every two years; a 17 foot drawdown—once every five years; a 20 foot decrease—once every ten years; and one of 23 feet—once every twenty years.

The project is also designed to include extensive recreational activities which are associated with a lake development.

## ENVIRONMENTAL IMPACT OF THE PROJECT

No project of any size is without its environmental impact, and the present one is no exception. The Corps itself admits that the project will have an environmental impact. Of the approximately 8,400 acres acquired for the project, about 2,530 acres will be permanently inundated. Twelve miles of the Jackson River, presently free flowing, will be permanently inundated.

At the dam site itself, the construction activity has caused the baring excavation and destruction of part of Kincaid Gorge. The gorge has been scarred and as the lake fills, about three-fourths of it will be under water. Construction will also have the short term effect of depositing increasing amounts of earth and rock into the river.

The creation of the lake will force the relocation of roads and utilities, and make other changes in the area, thus having an effect on the natural environment.

As the dam nears completion, most of the timber, standing and downed, will be removed from the area to be covered by the lake. Tree and shrub clearing will take place over most of the lake bottom and will extend up to between five feet below and three feet above the maximum height of the lake (level 155 feet).

## JURISDICTION

Jurisdiction is vested in this court by reason of 28 U.S.C. § 1331 because this case arises under a law of the United States, namely 42 U.S.C. § 4331. In addition, 5 U.S.C. §§ 701–706 provide additional grounds for this court's jurisdiction and for review of the federal defendants' decision to proceed with the dam's construction.

## PLAINTIFFS' CONTENTIONS AND RELIEF SOUGHT

The plaintiffs allege that the federal defendants have failed to comply with the following statutes and as a result their actions are illegal because their decision to construct the dam was arbitrary and capricious. They contend and allege:

1) that the benefit-cost ratio given by the Corps was arbitrary and capricious under the standards set forth in the National Environmental Policy Act (hereinafter referred to as NEPA), 42 U.S.C. § 4331 et seq., the Federal Water Pollution Control Act Amendments of 1972 (hereinafter referred to as the 1972 FWPCA Amendments), P.L. 92–500, October 18, 1972 (86 Stat. 816), the Fish and Wildlife Coordination Act of 1958, 16 U.S.C. § 661 et seq., and the Administrative Procedure Act, 5 U.S.C. § 701 et seq.; 2) that § 101 of NEPA (42 U.S.C. § 4331) was not adhered to; 3) that § 102 of NEPA (42 U.S.C. § 4332) was not complied with in that: a) the Corps failed to use a systematic interdisciplinary approach in planning and decision making; b) that the Corps failed to quantify and adequately consider the environmental amenities of and values of the area; c) that it failed to give adequate consideration to alternatives to the project; and d) that it failed to circulate and make available the draft and final Environmental Impact Statement (hereinafter referred to as the EIS) as required by 42 U.S.C. § 4332 (2)(C); 4) that the Corps is violating the 1972 FWPCA Amendments by counting low flow augmentation as a benefit of the project; 5) that it failed to give adequate consideration to the comments of other federal and state agencies and individuals in the final EIS, and 6) that the Corps is violating the Fish and Wildlife Coordination Act of 1958 because it has failed to carry out and perform its duties as required under this Act.

The Plaintiffs seek the following relief:

1) a declaratory judgment that the decision to proceed was arbitrary and capricious and gave insufficient weight to environmental factors; 2) a declaratory judgment that the defendants have failed to comply with 42 U.S.C. § 4332(2)(A)–(D); 3) a declaratory judgment that the decision to proceed violates § 102(b)(1) and § 102(b)(3) of the 1972 FWPCA Amendments; 4) a declaratory judgment that the decision to proceed violates 16 U.S.C. §§ 661, 662(a)–(b) of the Fish and Wildlife Coordination Act of 1958; and 5) that the court grant a permanent injunction against the dam's construction.

The plaintiffs also contend that the draft EIS is legally insufficient for various reasons; however, the court believes this to be a moot question because of the fact that the final EIS has been filed and supersedes the draft statement which was rejected by the Environmental Protection Agency.

## DEFENDANTS' CONTENTIONS

In brief, the defendants deny all the allegations and the positions taken by the plaintiffs. They assert that the Corps of Engineers has fully complied with all applicable laws and regulations and particularly that the EIS gives full and adequate treatment to all environmental factors and that the decision to proceed with the Gathright project is not arbitrary and capricious.

## CLASS ACTION

The plaintiffs have brought this suit as a class action under Rule 23 of the Federal Rules of Civil Procedure. Rule 23 sets forth certain criteria which must be met before a court may allow a suit to proceed as a class action. The court does not believe that this suit is a proper one for a class action for two reasons: First, the members of the class cannot reasonably be determined, and second, there is no reasonable method of giving such people proper notice as required by due process and Rule 23(c)(2).

## THE COURT'S ROLE

Before proceeding to the merits of the case, the court will first determine its role, function, and authority in this case. Because NEPA became effective only recently, January 1, 1970, the question about the court's role, function and authority in cases arising under NEPA has not been firmly settled.

The court believes that its role under NEPA is not only to see that government agencies have complied with all the procedural requirements, but also to engage in "substantial inquiry" to determine "whether there has been a clear error of judgment." Courts are allowed to delve into the decision making process on their own to determine if the agency's decision was arbitrary and capricious when viewed in terms of the data and information supplied and set forth in the EIS.

The Eighth Circuit has held that courts do within limits have the right to review the substantive agency decision, in stating:

"The unequivocal intent of NEPA is to require agencies to consider and give effect to the environmental goals set forth in the Act, not just to file detailed impact studies which will fill governmental archives.

The application of the substantive principles of NEPA is to be made by the agency through a 'careful and informal decision-making process.' . . . The agency must give environmental factors consideration along with economic and technical factors. 'To "consider" the former "along with" the latter must involve a balancing process.' . . .

Given an agency obligation to carry out the substantive requirements of the Act, we believe that courts have an obligation to review substantive agency decisions on the merits . . . NEPA is silent as to judi-

cial review, and no special reasons appear for not reviewing the decision of the agency. To the contrary, the prospect of substantive review should improve the quality of agency decisions and should make it more likely that the broad purposes of NEPA will be realized."

Environmental Defense Fund v. Corps. of Engineers of the United States Army, 470 F.2d 289 (8th Cir. 1972).

The Eighth Circuit later elaborated in Environmental Defense Fund v. Froehlke, 473 F.2d 346 (8th Cir. 1972) where it stated:

"The review is a limited one for the purpose of determining whether the agency reached its decision after a full, good faith consideration of environmental factors made under the standards set forth in §§ 101 and 102 of NEPA; and whether the actual balance of costs and benefits struck by the agency according to these standards was arbitrary or clearly gave insufficient weight to environmental factors." Accord, Conservation Council of North Carolina v. Froehlke, 473 F.2d 664 (4th Cir. 1973); Calvert Cliffs' Coordinating Comm. v. United States Atomic Energy Comm'n, 146 U.S.App.D.C. 33, 449 F.2d 1109 (1971); Lathan v. Volpe, 350 F.Supp. 262 (W.D.Wash.1972).

The Fourth Circuit cited the above quotation when it held that courts do have the authority to inquire into substantive decisions. Conservation Council of North Carolina v. Froehlke, 473 F.2d 664 (4th Cir. 1973), rev'g on rehearing, [4 ERC 1044] (4th Cir. 1972), rev'g 340 F.Supp. 222 (M.D.N.C.1972). The Fourth Circuit, after reiterating the Eighth Circuit quote from *Froehlke* further stated: "We think the District Court must engage in a 'substantial inquiry' to determine 'whether there has been a clear error of judgment.'"

The District of Columbia Circuit appears to follow the Fourth and Eighth Circuits' reasoning. See Calvert Cliffs' Coordinating Comm. v. United States Atomic Energy Comm'n, 146 U.S.App. D.C. 33, 449 F.2d 1109 (1971), while the Fifth Circuit has rejected this approach, taking the position the Court's only duty is to ascertain whether the procedural requirements under NEPA have been met, and that courts need not engage in the "substantial inquiry" required by other Circuits. Pizitz v. Volpe, [4 ERC 1195] (Md.Ala.1972), aff'd, 467 F.2d 208 (5th Cir. 1972).

The Eighth Circuit also stated that courts, while reviewing the substantive decisions could not substitute their own judgment for that of the agency.

Therefore, as this court examines the merits of this case, it will do so with an eye to determine whether the federal defendants gave adequate consideration to environmental factors and whether or not their decision to proceed was arbitrary and capricious.

## THE ENVIRONMENTAL IMPACT STATEMENT

The plaintiffs contend that the EIS filed by the Corps does not comply with the requirements of NEPA. Having so failed to comply with this Act, they contend that any decision which the Corps made could not have been made with full consideration of all environmental factors, and that its decision to proceed with the project was therefore arbitrary and capricious.

42 U.S.C. § 4332(2)(C) of NEPA requires that the EIS contain a discussion and analysis of five subject areas: 1) the environmental impact of the proposed action; 2) all adverse environmental effects which cannot be avoided; 3) alternatives to the project; 4) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and 5) any irreversible and irretrievable commitment of resources involved in the project.

The court is well aware that when studies of this type are undertaken, complete satisfaction with the re-

sults is impossible. As is true with most endeavors, further study and analysis will produce a better document which is subject to less criticism. However the purpose of an EIS is not to produce an objection free document, but rather to give Congress and other responsible agencies sufficient information on the project's environmental consequences with which to make an intelligent decision about whether or not to proceed with the project. Environmental Defense Fund v. Froehlke, 473 F.2d 346 (8th Cir. 1972); Environmental Defense Fund v. Armstrong, 352 F.Supp. 50 [4 ERC 1760] (N.D.Cal.1972). This act has been described as an environmental full disclosure act. Environmental Defense Fund v. Corps of Engineers of the United States Army, 325 F.Supp. 749 (E.D.Ark.1971).

"Chronic faultfinding" by itself will not invalidate an EIS, and if a detailed study has been made in accordance with the requirements of NEPA, the duty of the court will then be to determine whether the decision to proceed was arbitrary and capricious, and not whether another scientific study should be made. Lathan v. Volpe, 350 F.Supp. 262 [4 ERC 1487] (W.D.Wash.1972).

The court in Committee for Nuclear Responsibility, Inc. v. Seaborg, 463 F.2d 783, 787 (D.C.Cir.1971) remarked:

"When . . . the issue of procedure relates to the sufficiency of the presentation in the statement, the court is not to rule on the relative merits of competing scientific opinion. Its function is only to assure that the statement sets forth the opposing scientific views and does not take the arbitrary and impermissible approach of completely omitting from the statement, and hence from the focus that the statement was intended to provide for the deciding officials, any reference whatsoever to the existence of responsible scientific opinions concerning possible adverse environmental effects."

Finally, it has been held that while an EIS must give some weight to opposing views, the mere fact that there exist certain deficiencies or inadequacies does not necessarily mean that NEPA has not been complied with. Such inadequacies or deficiencies can always be brought to the attention of Congress and other decision makers through the usual methods of communication, whether political or otherwise. Environmental Defense Fund v. Corps of Engineers of the United States Army, 342 F.Supp. 1211 (E.D.Ark.1972), aff'd, 470 F.2d 289 (8th Cir. 1972).

When an EIS is prepared for a project already authorized and under construction, it has been held that the agency may take into account the fact that part of the project has been completed. Arlington v. Volpe, 458 F.2d 1323 (4th Cir. 1972); Environmental Defense Fund v. Corps of Engineers of the United States Army, 325 F.Supp. 728 (E.D.Ark.1971). While approximately 30% of the Gathright project is completed, the court takes the position that notwithstanding money already spent and work already done, it will look at the situation afresh to be sure that the Corps based its decision not upon the amount of money and time already spent but upon a thorough analysis of all environmental and economic factors.

In the trial and in their post-trial briefs, the plaintiffs contend that the EIS was deficient in six areas: 1) that the Corps failed to properly determine and quantify all benefits and costs of the project; 2) that the recreational benefits did not receive full attention and were overstated; 3) that the Corps has failed to comply with the Fish and Wildlife Coordination Act of 1958 by not attempting to mitigate the loss of this area to the state; 4) that low flow augmentation was improperly included as a benefit; 5) that the Corps failed to adequately consider alternatives; and 6) that the project's discount rate is unreasonably low.

## BENEFITS AND COSTS

Throughout the trial the plaintiffs have been concerned with the Corps'

method of determining the benefit-cost ratio. (Hereinafter referred to as the B/C ratio). The plaintiffs argue that certain items were improperly included as benefits, while other items, which they considered as costs, were not included.

In the opening pages of the EIS the Corps stated that the benefit-cost ratio is 1.1. The plaintiffs contend that if they are able to show that all the costs were not included or that the benefits were overstated, then the B/C ratio would be less than 1.0, in which event they argue that the court must halt further construction. 33 U.S.C. § 701a states that before a flood control project is allowed to proceed, its benefits must exceed its costs. Thus in the plaintiffs' view the decision to proceed was arbitrary and capricious,—having failed to use NEPA B/C standards.

The fallacy with the plaintiffs' theory is that authorization for this project is not based upon NEPA, but rather upon the Flood Control Act of 1946, a predecessor of 33 U.S.C. § 701 et seq. The sole purpose of NEPA is to ensure that the environmental effects of a project are given full and adequate consideration by the decision maker.

Calculations of B/C ratios under the Flood Control Act and under NEPA are different. With respect to the Flood Control Act, the Senate passed a document entitled "Policies, Standards, and Procedures in the Formulation, Evaluation, and Review of Plans for the Use of Water and Related Land Resources", S. Doc. No. 97, 87th Cong., 2d Sess. (1962). This document sets forth in detail the procedures and criteria which various agencies must use to determine the B/C ratio of a project. It has been held that because of the innumerable number of methods of deriving them, B/C ratios, computed under 33 U.S.C. § 701a, are not judicially reviewable, but are solely a matter for Congressional determination. United States v. West Virginia Power Co., 122 F.2d 733 (4th Cir. 1941), cert. denied, 314 U.S. 683, 62 S.Ct. 187, 86 L.Ed. 547 (1941); Sierra Club v.

Froehlke, 359 F.Supp. 1289 (S.D.Tex. 1973); Environmental Defense Fund v. Corps of Engineers of the United States Army, 325 F.Supp. 728, 740 (E.D.Ark. 1971), aff'd, 470 F.2d 289 (8th Cir. 1972).

The method of determining B/C ratios under NEPA is much broader than under Senate Document No. 97. Costs which a court might determine should be included under NEPA standards, might not be included under the Congressional standards of Senate Document No. 97. In the court's opinion the NEPA B/C ratio, rather than itself being the determining or deciding factor in cases brought under NEPA, is to be used only to enable the court and other decision makers to determine whether all environmental factors of a project have been given full and adequate consideration.

Because Congress has authorized the Gathright project, it has determined that the project met the criterion set forth in 33 U.S.C. § 701a. Even if under NEPA costs might exceed the benefits, this court does not believe that such reason would be authority to stop the project. If the plaintiffs believe that B/C ratios should be computed using NEPA standards, then they should make their views known to Congress. While Congress may in the future choose to rely upon NEPA B/C ratios, that is the prerogative of Congress and not of this court. With respect to these proceedings the B/C ratio is important only to determine whether or not the environmental factors have been properly and adequately considered. The exact value of the B/C ratio in this instance does not dispose of the case but merely aids the court in its task of determining whether all factors have been taken into account, after which the court may rule on whether the agency's decision to proceed was arbitrary and capricious.

To calculate B/C ratio under NEPA, the agency proposing the action must look at the total effect of the action not only upon the environment, but also upon local and state governments and

any other groups which might be adversely affected.

For example, during the course of the trial the plaintiffs emphasized the value of the land to be transferred in relation to the price to be paid and also the price and availability of commensurate land. Under the Pittman-Robertson Act the Commonwealth of Virginia is required to reinvest the money received from the Gathright property in other land of equal value within three years. If this is not done, then the Commonwealth will lose some portion of its Pittman-Robertson Funds.

The plaintiffs contend first that the land is so unique that replacement land cannot be obtained which will satisfy the requirements of the Pittman-Robertson Act, and, second if such land is available, its cost would be far in excess of the $650,000 which the Corps is paying for the Gathright area.

■ The plaintiffs' first contention would not be considered a cost under NEPA because it is mere speculation as to whether Virginia will lose any funds. While a comment about this possibility might properly have been mentioned in the EIS, the Corps is not required to attempt to compute any uncertain loss of funds.

If by reason of increased land values the purchase of commensurate land to replace that to be sold by the Game Commission will require an additional expenditure of funds in excess of the $650,000 to be received, then such excess should be considered as a cost of the project by the Corps.

■ Because the evidence, whether additional sums will be needed, is conflicting, and because of the speculative nature of the argument, the court holds that the Corps has acted in good faith and its determination of this matter should not be disturbed by the court.

## QUANTIFICATION OF ENVIRONMENTAL AMENITIES

The plaintiffs contend that there has been no quantification of such items as the value of a free-flowing stream, or of a view, or of the entire tract as it now exists. Valuation of such items is difficult, if not impossible, to calculate because their value depends to a large extent upon subjective rather than objective analysis.

■ The court does not believe that failure to quantify such environmental amenities renders the EIS deficient under NEPA. At present there does not appear to be any method of calculating such values, nor do the plaintiffs offer any suggestions to resolve the problem. All that the EIS need do to comply with NEPA is to note that such a deficiency exists. Environmental Defense Fund v. Corps of Engineers of the United States Army, 325 F.Supp. 749, 758 (E.D.Ark. 1971), aff'd, 470 F.2d 289 [4 ERC 1721] (8th Cir. 1972). The court believes that in this regard the Corps has adequately complied with NEPA.

■ While the Corps stated the B/C ratio for this project, nowhere in the EIS is there any statement or comment on how this figure is derived or what benefits and costs were used. The court believes that if the purpose of an EIS is to advise Congress of all environmental consequences of a proposed action, then the EIS should contain a section which first explains how the benefits and costs are calculated, and then detail what items are included as a benefit or cost and the valuation of each. It is the belief of this court that such a section would be informative and useful to Congress and to administrative bodies.

The court hereby directs the Corps within 60 days to prepare and file with all appropriate agencies and authorities a supplement to the EIS which will explain and inform those interested of the methods used by the Corps to determine its NEPA B/C ratio and which sets forth what items were considered as a benefit and as a cost and the valuation of each.

In requiring the addendum to the EIS the court does not mean to indicate that the Corps' decision to proceed is arbi-

trary or capricious. To the contrary, the court is of the opinion that the Corps has adequately considered the environmental aspect of the undertaking, but that the EIS itself does not fully disclose the extent of such consideration.

## RECREATION

During the course of the trial, the plaintiffs stressed the following: 1) that the area is unique; 2) that it is very productive in animal life; 3) that other more suitable areas exist for lake recreation; 4) that the recreation benefits are overstated; 5) that the effect of the project upon existing state roads has not been considered in detail; and 6) that the proposed downstream fishery is of little value because of access problems.

Plaintiffs strongly urged during the trial the uniqueness and irreplaceability of the area. They contend that these two factors have not been quantified and calculated as a cost of the project. The defendants' witnesses opposed the plaintiffs' characterization of the area as unique and irreplaceable, and attempted to prove that it did not possess such unique and special qualities. The Corps contended that the uniqueness factor was taken into account when the price of the land was determined. The court does not believe that it must resolve this issue for it is subjective and not disposed to any methods of objective evaluation.

Several of the plaintiffs' witnesses testified not only about the uniqueness of the area, but also about the high animal productivity within it and the effect which its loss will have upon existing wildlife. The court agrees with the plaintiffs that the loss of this area will indeed have certain detrimental effects upon wildlife in the area; however, the court believes that the plaintiffs have failed to disclose anything not already sufficiently covered by the EIS.

The plaintiffs attempted to prove that there were other areas better suited for lake recreation which were not considered as alternative sites for the project. With this contention the court disagrees, for evidence was introduced that alternative sites were considered.

The contention has been made during the trial and in the post-trial briefs that the recreational benefits of the project have been overstated. The Corps estimates that there will be 400,000 visits per year to the Gathright lake area. Within a fifty mile radius of the project approximately 400,000 people live, of whom over one-fourth live in the Roanoke area, which plaintiffs contend can be served by Smith Mountain Lake. The plaintiffs argue that if the Corps' estimate is to be accepted, it would seem that every person within this fifty mile radius must visit Gathright. They contend that this estimate cannot be accepted as having been made in good faith because the people on the Roanoke area will be more inclined to attend the nearer Smith Mountain area.

The fallacy with this argument is that it does not correctly interpret the Corps' figure. Under the Corps' method of calculation every day which an individual spends at Gathright counts as a visit. Therefore ten continuous days spent by one individual is considered to be not one, but ten visits. Evidence was introduced by the Corps that the visitation figures were, if anything, too low rather than too high, citing Philpott Dam with its 886,000 visitors per year. Although the plaintiffs might object to the Corps' method or procedure used to derive recreational benefits, the court is not in a position to substitute its judgment for that of the Corps' unless the method used by the Corps is on its face unfair or arbitrary. Methods of quantification are without question matters of judgment and opinion and as such not subject to court review in the absence of bad faith.

A second controversy in this area of recreational benefit quantification is the fact that the Corps used West Virginia visitation rates for the Gathright project rather than Virginia rates. The

West Virginia rate is 2.16 while the Virginia figure is only .50. The plaintiffs challenge the use of this higher figure, contending that its selection demonstrates without question the Corps' arbitrary manner of assigning values and determining benefits.

The Corps justifies its use of the higher figure because of the fact that the Gathright area is similar in many respects to West Virginia. The Virginia figure, they argue, includes not only mountain type recreation, but also seashore recreation which does not occur in West Virginia. The Corps also discussed at trial the effect which individual's income has upon their usage of public recreational areas. The court believes that the Corps is not required to use the Virginia figure if sufficient reasons exist for not using it. In the court's opinion the Corps has shown that the West Virginia figure was selected only after careful thought and analysis and this determination cannot be termed arbitrary and capricious.

The plaintiffs by introducing evidence of anticipated traffic focused on the problem of access and entry into the proposed recreational areas. They contend that Virginia will be required to spend additional sums to improve and upgrade the surrounding roads to meet the expected large increase in the amount of traffic caused by the project. The court notes here that on the one hand the plaintiffs argue that the Corps has overstated the number of people who will visit the area and on the other hand they have offered evidence that the traffic will be so heavy that the existing roads will not be adequate to handle it.

The plaintiffs argue that the Corps did not fully consider the effect which the project would have upon the existing road structure, and that any costs incurred by the state to update its roads by reason of Gathright should be included as a cost of the project.

We agree under the NEPA standard of determining costs, any money which the state spends solely as a result of Gathright to upgrade its roads should be considered as a cost. The court heard evidence that many of Virginia's roads in the Gathright area do not presently meet the local highway standards. If the increased use of these roads requires the state to upgrade them to meet the minimum standards, then such expenditures should not be included as a NEPA cost. Amounts spent above this to meet the Gathright demand should be included.

The court finds that the Corps has given sufficient consideration to the project's effect upon existing state roads to meet the NEPA requirements. Indeed the thrust of the plaintiffs' argument is that such amounts were not included as a project cost. As previously determined, however, the determination of what costs are to be included to calculate the project B/C ratio is for Congress.

Finally, the plaintiffs have taken exception to the Corps' treatment in the EIS of the downstream fishery. In the EIS the Corps notes that many riparian owners of land along the Jackson River contend that the river is non-navigable and that their ownership extends to the middle of the river bed. Thus anyone who boated or fished in the river would be subject to being prosecuted as a trespasser. The Corps then states that it has examined the problem and determined that the river is navigable and title to the river bottom is vested in the government.

The EIS leaves one with the impression that while there may be future litigation as to the navigability of the Jackson River, the Corps has concluded that the river is navigable, and the court cannot say that such conclusion was reached arbitrarily. If the stream is declared to be non-navigable, the state will not be able to stock the river below the dam. Under state regulations the Commission of Game and Inland Fisheries may stock only those rivers which are open to the public. The Virginia Supreme Court has held that

the river is non-navigable. Boerner v. McCallister, 197 Va. 169, 89 S.E.2d 23 (1955). The court believes that the Corps should in the supplemental statement to be filed discuss in more detail the question of navigability and the effect on the downstream fishery, if the river is declared to be non-navigable.

## THE FISH & WILDLIFE COORDINATION ACT OF 1958

Throughout the trial and in their post-trial brief, plaintiffs have attempted to establish that the Corps has not complied with the Fish and Wildlife Coordination Act of 1958, 16 U.S.C. § 661 et seq., because the Corps has at present no plan to mitigate the loss of the Gathright area to the Virginia Commission of Game and Inland Fisheries. The plaintiffs contend that under the Fish and Wildlife Coordination Act of 1958 the Corps is under a duty to mitigate the loss to be sustained by the State.

Emphasis by the plaintiffs is placed upon what they consider to be the low price for the lands sold by the Commonwealth. Evidence was offered in court that the average price to be paid to the State for Gathright will be $114 per acre, while some private individuals have been paid $258 per acre. A survey of what other states consider the value of lands similar to Gathright to be was introduced, the highest price being $1500 per acre.

It is not the duty of this court to decide whether or not the price to be paid for the land is adequate or inadequate. Such a determination is made solely between the Corps and the State. The court has no power to order the Corps to pay more. Indeed the Virginia General Assembly in its most recent session turned down a bill which would have allowed a re-appraisal or re-negotiation of the matter.

As previously noted, however, the court does believe that any amount which Virginia must pay in excess of the $620,000, it will receive to meet the requirements of the Pittman-Robertson Act should be included as a NEPA cost of the overall project.

The plaintiffs have also continuously referred to the 1964 "agreement" between the Corps and the Game Commission, contending that the Corps has to this date not implemented any of the three items "agreed" upon. In reality, however, these three items did not comprise an agreement, but were only guidelines for further negotiations. After this first 1964 meeting, several other meetings took place in which discussions ensued concerning the manner in which the Corps would recompense the Game Commission for the loss of the Gathright area. The culmination of these negotiations resulted in an agreement in which the Corps agreed to pay the Commission $620,000 for the land and agreed to: 1) grant a long-term or permanent license to the Commission for the use of Leatherwood Lodge; 2) provide for vehicular access to the Coles Mountain Fire Trail; 3) provide for vehicular access to part of Bolar Ridge; 4) provide for vehicular access through Lemon Hollow to Alleghany Mountain; 5) negotiate for a right-of-way over private land for use by the Commission; 6) provide for hunter usage of a buffer strip surrounding the lake; 7) set aside some timber area for fish propagation purposes; 8) purchase six downstream access points for future licensing to the Commission; and 9) grant the Commission the responsibility for regulating fish and wildlife activities and boating on the lake. 16 U.S.C. § 661 et seq. only requires that the Corps attempt to mitigate losses by discussing and consulting with the appropriate state and federal agencies. The Corps, although it may recommend mitigation plans to Congress, has no authority to provide for mitigation under this act in the absence of specific Congressional authorization. See Akers v. Resor, 339 F.Supp. 1375 (W.D.Tenn.1972). It has been held that if the Corps complies in good faith with the requirements of NEPA, then it will automatically comply with the Fish and Wildlife Coordination Act of 1958. En-

vironmental Defense Fund v. Froehlke, 473 F.2d 346 (8th Cir. 1972); Akers v. Resor, 339 F.Supp. 1375 (W.D.Tenn. 1972); Environmental Defense Fund v. Corps of Engineers of the United States Army, 325 F.Supp. 749 (E.D.Ark.1971), aff'd, 470 F.2d 289 (8th Cir. 1972).

 Although compliance with NEPA is also a de facto compliance with the Fish and Wildlife Coordination Act of 1958, nevertheless one court has held that the plaintiffs may still attempt to prove that the Corps has departed from the Congressional policies set forth in this act, and that if such departures existed, they should be acknowledged in any EIS prepared by the Corps. Environmental Defense Fund v. Corps of Engineers of the United States Army, 325 F.Supp. 749, 754 (E.D.Ark.1971), aff'd, 470 F.2d 289 (8th Cir. 1972). With respect to this issue the court finds that the Corps has not departed from the Congressional intent or policies of 16 U.S.C. § 661 et seq.

### 1972 FWPCA AMENDMENTS

This legislation was enacted into law on October 18, 1972. Two pertinent sections of this act are § 102(b)(1) and § 102(b)(3).

§ 102(b)(1) reads:

"In the survey or planning of any reservoir by the Corps of Engineers, Bureau of Reclamation, or other Federal agency, consideration shall be given to inclusion of storage for regulation of streamflow, except that any such storage and water releases shall not be provided as a substitute for adequate treatment or other methods of controlling waste at the source."

§ 102(b)(3) reads:

"The need for, the value of, and the impact of, storage for water quality control shall be determined by the Administrator, and his views on these matters shall be set forth in any report or presentation to Congress proposing authorization or construction of any reservoir including such storage."

The plaintiffs contend that low flow augmentation, as currently proposed, is to be used as a substitute for waste treatment at the source. They rely heavily upon the March 12, 1973 letter of the Administrator of the Environmental Protection Agency, William D. Ruckelshaus, to Major General Morris of the Corps of Engineers which says that no downstream water quality benefits may be assigned to the project.

The theory behind the plaintiffs' contention is that if water quality benefits, estimated by the Corps to comprise about 40% of the total benefits, are entirely eliminated from the project, then the benefit-cost ratio, which is presently 1.1, will fall well below the necessary 1.0 ratio required for federal projects. The Corps' decision to proceed, they argue, is therefore arbitrary and capricious.

The Corps of Engineers and the other defendants take the position that the amendments do not apply to the Gathright project because it was authorized in 1946 and was begun in 1968. These amendments, they contend, were not intended to amend or repeal any prior Congressional legislation because of the absence of any specific language to this effect.

The question which this court must decide with respect to these amendments is first whether these amendments apply to the present project, and second if the determination is made that they do apply to the project, how they are affected by NEPA.

 As previously stated, NEPA is a full disclosure act, the purpose of which is to inform Congress and other decision makers of all the environmental as well as economic effects of a project. The court believes that an EIS to comply with NEPA must inform the decision makers not only of past and present situations within a project, but also of future potential circumstances, situations, or problems. In the present action the enactment of the 1972 FWPCA Amendments might have a future effect

upon one of the authorized purposes of the project—water quality control.

It is the belief of the court that any determination of the applicability of the 1972 FWPCA Amendments is directly related to the calculation of the B/C ratio. The plaintiffs, by arguing that they do apply to the project, are in reality contending that the elimination of water quality control as a benefit will reduce the benefit-cost ratio to .68. The Corps, on the other hand, by maintaining that they do not apply to the project is in effect insisting that its method of determining the B/C ratio is correct.

[redacted] Because the real effect of the amendments is upon the method used to compute the B/C ratio, the court must maintain its previous position with respect to this subject. The methodology to be used in computing the B/C ratio lies solely within the discretion of Congress. The court cannot enjoin the expenditure of funds merely because it appears that the B/C ratio will be below 1.0. While Congress may determine that NEPA methods to calculate benefits and costs are to be its criterion for project approval, this court has no such authority.

By way of example the court will note four figures given by one of plaintiffs' witnesses who testified on this point. According to one series of computations made by him, the present B/C ratio for the project is 1.14. Because approximately $17 million has already been spent and cannot be recovered, then, by deleting this sum and considering the project as if it were to begin today, the B/C ratio becomes 1.58. By subtracting all water quality benefits, however, this witness indicated that the ratio would decline to .68. But if the $17 million were also excluded from this latter computation, then the ratio becomes .95, which is very close to the necessary 1.0. The court can only say that it is for Congress to determine the proper method to be used.

The court does find, however, that the Corps has not complied with the full disclosure requirements of NEPA. The decision that the 1972 FWPCA Amendments do not apply is, the court believes, within the Corps' discretion and cannot be challenged if made in a good faith and unbiased manner. However, one of the purposes of an EIS is to set forth opposing views. As one court stated:

> "Only *responsible* opposing views need be included [in an EIS] and hence there is room for discretion on the part of the officials preparing the statement; but there is no room for an assumption that their determination is conclusive. The agency need not set forth at full length [the] views with which it disagrees, all that is required is a meaningful reference that identifies the problem at hand for the responsible official."

Committee for Nuclear Responsibility, Inc. v. Seaborg, 149 U.S.App.D.C. 380, 463 F.2d 783, 787 (1971).

The EIS contains some discussion of the 1972 FWPCA Amendments. The court finds this discussion to be incomplete under the full disclosure requirement of NEPA, because Congress and other decision makers are not informed that one of the purposes of the project may be unnecessary in the future. Because the 1972 FWPCA Amendments might have an effect upon the need for low flow augmentation in the future, and thus upon the benefits attributed to this purpose, the Corps must adequately consider them. The court therefore holds that the Corps must take note of the effect of the 1972 FWPCA Amendments on the project. To achieve this end, in addition to any discussion on the amendments, the Corps is ordered to recalculate the benefits of the project and exclude as a benefit the types of pollution which the amendments are intended to eliminate. Because the calculation of the B/C ratio, which is beyond the scope of the court's inquiry and to which the amendments directly relate, is a matter for Congressional determination, the Corps may make its position on the amendments known in the EIS and

may set forth its own determination of the B/C ratio.

The court believes that the duty to eliminate their own pollution should be borne by industry and local municipalities, and Congress, by enacting the 1972 FWPCA Amendments, has so placed this responsibility. While under § 102(b)(3) of the amendments, the Administrator may make a determination of the benefits to be assigned to water quality control, this determination is not final or conclusive, for Congress is not obligated to accept it. Being an administrative decision, it is also subject to court review. § 102(b)(1) makes it clear that only low flow augmentation intended as a substitute for adequate waste treatment shall receive no benefit. This section does specifically state, however, that in every reservoir project consideration shall be given to water storage for stream regulation—in other words, low flow augmentation. The court believes that the use of this language indicates that there are benefits attributable to low flow augmentation which may be applied as such to the project.

The evidence in this case has been heard and considered at length by the court, and it believes that based upon the evidence the following items may be included as benefits to be received from low flow augmentation as intended by § 102(b)(1): Augmentation—

1) to aid the City of Richmond in its domestic water supply;

2) to aid the City of Lynchburg in its domestic water supply;

3) to provide a more sanitary and healthful river downstream to Richmond by eliminating stagnating pools;

4) to aid the environmental and aesthetic appearance of the river and provide increased recreational benefits;

5) to aid all localities on the Jackson and James Rivers downstream to Richmond by lessening the effects of agricultural runoff, deposits, and other undesirable substances;

6) to improve the quality of riverfishing downstream from the dam.

In conclusion, the court will make one final observation with respect to this matter. Because Congress has authorized water quality control to be included as a benefit in this project, the court has no authority to eliminate it. In the opinion of the court the 1972 FWPCA Amendments are merely a method which defines how water quality benefits are to be calculated. Viewed in this light, they then become part of the methodology approved by Congress to determine B/C ratios. Congress, therefore, and not this court, is the final authority on the question of whether or not this method of determining water quality benefits is to be applied retroactively to projects already under construction. The Corps however must make a full and frank disclosure of the entire controversy surrounding these amendments in the EIS for the benefit of Congress and other decision makers.

As previously stated, the question for the court's determination is first, the applicability of these amendments to the present project and second, their effect upon the requirements of NEPA. After due consideration the court holds that, because these amendments are in reality a method of determining how water quality benefits are calculated, the question of their applicability to projects authorized prior to their enactment is for Congress and not the court to determine.

With respect to the second question the court holds that the 1972 FWPCA Amendments as they relate to the present litigation are affected by NEPA's requirements. To this end the court has determined that the procedural requirements of NEPA have not been met with respect to the 1972 FWPCA Amendments and has directed the Corps to include in the addendum a discussion of them and their potential effect upon the project.

Although the Corps is requested to file an addendum containing such discussion, in the court's opinion the Corps

did seriously consider the applicability of and the effects of these amendments to the present project. The court finds that the determination that they do not apply was made in good faith, particularly because of the general law that statutes do not apply retroactively and because of the ambiguity present in § 102(b)(3), which indicates that the amendments apply only to any report *proposing* authorization or construction.

## FLOOD CONTROL

The plaintiffs' contentions both in the trial and in their post-trial briefs with respect to this aspect of the project concern the discussion of alternatives. The EIS lists nine alternatives as substitutes for the dam which would provide some degree of flood control. The plaintiffs object to such discussion of alternatives on two grounds: 1) that each alternative was considered only by itself as a substitute for the dam rather than in various combinations, and 2) that the Corps did not compile and set forth sufficient data upon which to base its conclusions.

As the court stated in Environmental Defense Fund v. Froehlke, 473 F.2d 346 (8th Cir. 1972):

"To fulfill these mandates [of 42 U.S.C. 4332(2)(C)(iii)], the impact [study] should not just list the alternatives to the proposed [action] but it should also include the results of the Corps' own investigation and evaluation of alternatives so that the reasons for the choice of a course of action are clear."

The question for this court to determine is whether all reasonable alternatives to the proposed action, some of which may only have been briefly discussed, have been considered and studied in good faith. Environmental Defense Fund v. Corps of Engineers of the United States Army, 470 F.2d 289 (8th Cir. 1972); Environmental Defense Fund v. Armstrong, 352 F.Supp. 50 [4 ERC 1760] (N.D.Cal.1972).

Under their first theory plaintiffs contend that the Corps was arbitrary and capricious in its decision because it did not consider a combination of alternatives. Plaintiffs' expert in this area readily admitted that any particular nonstructural alternative would not by itself be sufficient to provide as much protection as the proposed dam. The witness contended, however, that had the Corps considered a combination of some of the proposed alternatives, then the Corps might well have found that another feasible alternative did exist. To establish that such a study might produce workable results, the plaintiffs introduced a study of the City of Buena Vista, in which such combinations were, in their opinion, thoroughly and adequately discussed.

In line with this first argument, the plaintiffs attempted to prove that the Corps did not undertake a study to acquire detailed data upon the feasibility of each alternative or a combination thereof with which to make an intelligent decision, but that it relied at times on outdated data and only partial and incomplete studies. The defendants stressed experience and a working knowledge of the area as justification for the absence of some detailed data.

While the EIS itself does not reveal that any alternatives were considered in combination with one another, the testimony of various witnesses elicited in court, confirms in the court's mind that the Corps did consider several of these combinations and rejected them after due consideration of all the facts and data available.

In so holding the court recognizes that there must be some data upon which the individual bases his opinion. NEPA however does not require mass studies, and compilations and computations of data for an alternative, the feasibility of which could be determined after only minor study. While the plaintiffs desire detailed studies and collections of such data, the court believes that the Corps need collect only as

much data as will be necessary for the Corps to determine that the alternative is either infeasible or warrants further attention. NEPA deos not preclude an agency from relying on past experience, judgment, and knowledge of the area when it makes a determination about the feasibility of a project's alternatives. If such a determination is made in good faith and without bias, then the collection of voluminous amount of data is unnecessary.

█ Having heard the testimony of the Corps' witnesses, the court believes that the Corps did not arbitrarily reject any alternative, but did give such attention and consideration as that particular alternative or combination of alternatives merited.

As the court in Environmental Defense Fund v. Corps of Engineers of the United States Army, 342 F.Supp. 1211, 1217 (E.D.Ark.1972), aff'd, 470 F.2d 289 (8th Cir. 1972) stated:

"Congress, we must assume, intended and expected the courts to interpret the NEPA in a reasonable manner in order to effectuate its obvious purposes and objectives. It is doubtful that any agency, however objective, however sincere, however well-staffed, and however well financed, could come up with a perfect environmental impact statement in connection with any major project. Further studies, evaluations and analyses by experts are almost certain to reveal inadequacies or deficiencies. But even such deficiencies and inadequacies, discovered after the fact, can be brought to the attention of the decision-makers, including, ultimately, the President and Congress itself."

While the discussion of alternatives in the EIS may in some places be less informative than the answers which were given in open court, the court feels that their discussion in the EIS was adequate and will not require the Corps to rewrite this section, but will allow them to make such changes and additions which they desire.

Another objection which the plaintiffs had in the area of flood control was the Corps' increasing the benefits attributable to flood control below Lynchburg to Richmond, from almost nothing to 44% of the flood control benefits. The court can only say with respect to this objection, that during the course of the trial, it heard sufficient testimony which established that this increase was based upon firm data and not speculation or the desire to increase the benefits to achieve a favorable B/C ratio.

## DISCOUNT RATE

█ The plaintiffs challenge the interest rate and the period used by the Corps to amortize the project and to calculate the benefits and costs. The interest rate used is $3\frac{1}{8}\%$, and the time period is 100 years. Both figures, however, have been approved by Congress and were valid at the time the project was authorized. Courts have held consistently that the discount rate used on any particular project is not subject to judicial review, but lies solely within the discretion of Congress. Environmental Defense Fund v. Armstrong, 352 F. Supp. 50 (N.D.Cal.1972); Environmental Defense Fund v. Corps of Engineers of the United States Army, 348 F.Supp. 916 (N.D.Miss.1972); Environmental Defense Fund v. Corps of Engineers of the United States Army, 325 F.Supp. 728 (E.D.Ark.1971), aff'd, 470 F.2d 289 (8th Cir. 1972). Therefore, with respect to this contention, the court is without authority to challenge the discount rate by the Corps of Engineers.

## CONCLUSION

It is the determination of this court that the Corps did not act in an arbitrary and capricious manner when it decided to proceed with the Gathright project. While the plaintiffs emphasize the fact that the B/C ratio is, in their opinion, below 1.0, the court believes that under NEPA the function of this ratio is merely to aid the court in determining whether all benefits and costs of

a project have been considered. It is not in itself meant to be the deciding or determining factor.

The court believes that on the whole the EIS is not based upon personal notions or preferences, nor does it appear to be a whimsical, erratic or capricious study. While the court has required that certain items be supplemented in the EIS, this action is taken only because the court believes that the informational requirements of the statute have not been fully met. The court believes that, although not fully set forth in the EIS, the Corps did consider all the aspects of this project, environmental and otherwise, before it made the decision to proceed.

The court believes that an injunction is only a proper remedy where it is clear that the Corps did not adequately consider the environmental aspects of a project. See Environmental Defense Fund v. Corps of Engineers of the United States Army, 325 F.Supp. 749 (E.D.Ark.1971), aff'd, 470 F.2d 289 (8th Cir. 1972). Where, as in the present case, all the environmental aspects have been considered, an injunction should not be granted.

For reasons stated, this court, after making substantial inquiry to determine whether there has been a clear error of judgment, cannot say upon consideration of the totality of the facts, circumstances and applicable law that the decision of the Corps of Engineers to proceed with Gathright is arbitrary and capricious. The court therefore denies the respective motions of plaintiffs and plaintiff-intervenors for a declaratory judgment in their favor, and denies their respective motions for summary judgment, and likewise denies their motions for a temporary and permanent injunction, it is so adjudged and ordered. The court doth further adjudge that the Corps of Engineers may proceed forthwith with the construction of the Gathright project as planned.

The action of plaintiffs and plaintiff-intervenors is hereby dismissed without costs.

This court, conscious that in all probability this decision will be appealed to the Court of Appeals for the Fourth Circuit, doth fix an appeal bond in the amount of $500, conditioned to pay costs and damages on appeal. Should plaintiffs or plaintiff-intervenors seek injunctive relief in the Court of Appeals, then the court, if injunctive relief is granted, will fix the amount and conditions of such bond.