CITY OF NORTH MIAMI, FLORIDA,
Plaintiff,

v.

Russell E. TRAIN, Defendants.

No. 74–714–Civ–WM.

United States District Court,
S. D. Florida.

June 28, 1974.

Richard H. Porter, Steptoe & Johnson, Washington, D. C., Arthur J. Wolfson, City Atty., City of North Miami, North Miami, Fla., for plaintiff.

Bradford F. Whitman, Dept. of Justice, Washington, D. C., for Federal defendants.

Stuart Simon, County Atty., Alan T. Dimond, Clifford A. Schulman, Asst. County Attys., Miami, Fla., for Metropolitan Dade County.

John S. Lloyd, City Atty., Miami, Fla., for City of Miami.

MEHRTENS, District Judge.

The City of North Miami, Florida, brought this action seeking a declaratory judgment, mandamus and injunctive relief against the Environmental Protection Agency (EPA) and various administrators to prevent the EPA from approving applications by Metropolitan Dade County for funds to construct three regional treatment facilities. The complaint by the City of North Miami challenges the EPA for failure to comply with the requirements of the Water Pollution Control Act Amendments of 1972 (WPCA), Public Law 92–500, 86 Stat. 816, 33 U.S.C. § 1251 et seq. (1972), and the National Environmental Policy Act of 1969 (NEPA), Public Law 91–190, 83 Stat. 852, 42 U.S.C. § 4321 et seq. (1970), in reviewing applications for funds for the implementation of the Dade County Water Quality Management Plan (Master Plan).

The intervenors defending the challenge to the EPA are Metropolitan Dade County, a political subdivision of the State of Florida, also representing its Water and Sewer Authority and a nonprofit coalition consisting of the following non-governmental organizations: Tropical Audubon Society, League of Women Voters of Metropolitan Dade County, Progress for Dade, Inc. Builders Association of South Florida, Izaak Walton League of America, Miami Building and Construction Trades Council, Greater Miami Chamber of Commerce, and Engineering Contractors Association of

South Florida, Inc. Also intervening is the City of Miami, a potential indirect beneficiary of federal funds as they would finance the additional sewage treatment necessary to allow completion of its internal sewage collection system.

The complaint by the City of North Miami originally was filed in the District Court for the District of Columbia, and pursuant to the order of Judge John J. Sirica was transferred to the Southern District of Florida on. May 29, 1974. A temporary restraining order entered by Judge Sirica preserved the status quo until June 13, 1974, when plaintiff's Motion for Preliminary Injunction was considered and denied. On June 13, 1974, the parties entered into a stipulation, approved by the Court, designed to preserve the status quo pending an agreed expeditious disposition of this cause upon cross motions for summary judgment. The City of North Miami and the intervenors moved for summary judgment on June 24, 1974, on which date responses to outstanding requests for discovery were served by the federal defendants.

Having considered the motion for summary judgment and supporting affidavits by the federal defendants, filed on May 29, 1974, it appears that there are no genuine issues of material fact,[1] and that the federal defendants are entitled to judgment as a matter of law, based on the following facts and conclusions of law.

## FINDINGS OF FACT

*Material Facts as to Which There Is No Genuine Issue*

1. On September 25, 1970, Secretary of the Interior, Walter B. Hickel, at the request of Governor Claude R. Kirk, Jr., of Florida, convened a conference concerning pollution of the navigable waters including tributaries, embayments and coastal waters of Dade County, Florida, pursuant to Section 10 of the Federal Water Pollution Control Act, as amended, 33 U.S.C. § 1151 et seq. On October 20, 1970, the first session was held in Miami. Agencies attending were the Florida Department of Air and Water Pollution Control, the United States Department of the Interior and the Federal Water Quality Administration.

2. The final Federal Report concluded that (1) the 1,000 miles of canals of Dade County were grossly polluted and in violation of the County and state water quality standards; (2) widely used septic tanks were a public health hazard that contributed to over-enrichment and algae nuisances in adjacent waterways; (3) small "package" treatment plants constituted a potentially significant source of organic and bacterial pollution; (4) present methods for disposal through ocean outfalls *without adequate treatment* required modification because of public health hazards and detrimental effects of water quality; and (5) the *major* cause of poor water quality in Dade County was inadequately treated municipal sewage effluent. The conferees further concluded that pollution which endangers the health and welfare of Dade County residents was occurring, and that existing anti-pollution measures were inadequate.

3. The conferees recommended that the Metropolitan Dade County Commission present a master plan for abatement of pollution from all sources in Dade County by November 1, 1971. A time schedule for construction, for financing, for preparation of preliminary plans and specifications, for award of contracts, and for operation of such facilities was required.

The conferees also recommended (1) cessation of all waste water discharges into the inland canal system of Dade County not later than January 1, 1973; (2) providing a minimum of secondary treatment (90% BOD removal and year-round chlorination) for all ocean

---

1. The Court notes *infra* the issues of fact raised in "Plaintiff's Opposition to Federal Defendants' Statement of Material Facts," but is of the opinion that those facts and others remaining at issue are not material to the controlling issues in this cause.

discharges not later than January 1, 1974; (3) that all new construction be connected to adequate sewage collection and treatment systems; and (4) that the County prepare an action plan to control additional sources of pollution during the period of design and construction of the pollution abatement program. They further recommended the prohibition of additional waste water discharges to lower Biscayne Bay, its tributaries and canals that drain to the Everglades. Removal of discharge to these waters was to be accomplished as rapidly as possible, but not later than January 1, 1974.

4. As a result, the County applied for a planning grant under Section 3(c) of the Federal Water Pollution Control Act in February of 1971.

5. An "Amended Supplement to the 1961 Master Plan" set forth the concept of three regional waste water treatment and collection systems to be located in North Dade County, Central Dade County and South Dade County, Florida.

The conferees found Dade County's amended interim regional plan was acceptable as a first step in the development of the "Master Plan" but found it lacked an adequate time schedule for construction, arrangements for financing and consideration of *water reuse*. These shortcomings were then treated in the County's 1972 "Interim Water Quality Management Plan for Metropolitan Dade County, Florida". This plan was structured largely by the conclusions and recommendations of the three conference sessions.

6. Subsequently, the EPA and the federal Department of Housing and Urban Development issued planning grants to Dade County.

7. On June 2, 1972, the Board of County Commissioners of Dade County, Florida, selected several consulting firms to prepare an "Environmental Assessment of the Interim Water Quality Management Plan". The firms selected included local private consulting agencies, as well as companies or agencies from New York and Missouri. On September 1, 1972, the "Environmental Assessment" was completed.

8. On December 22, 1972, the EPA released a draft environmental impact statement entitled "Ocean Outfalls and Other Methods of Treated Wastewater Disposal in Southeast Florida" (hereinafter "Disposal Methods EIS"). Public hearings were held on the Disposal Methods EIS on January 24-27, 1973, and the final EIS encompassing approximately 343 pages of text and 389 pages of appendices, was released on March 21, 1973.

On April 13 and 27, 1973, draft environmental impact statements were also released on South, Central and North Dade County projects. Public hearings were held on May 14, 1973, and final statements were issued on September 10 and October 9, 1973. The final Environmental Impact Statements for North, Central and South Dade County encompassed 206, 100 and 192 pages of text and 245, 177 and 128 pages of appendices, respectively. Public hearings were also held on May 22, 1972, in connection with a draft EIS for the Palm Beach County Sewage Treatment Program, which hearings were published on December 20, 1972 and were incorporated within the Disposal Methods EIS at Appendix H. Public notice was given and public comments were received with respect to all EISs. Written comments were printed as part of the final statements.

9. Applications were filed with the EPA on behalf of the North, Central and South Dade County projects for federal funding under Title II of the Federal Water Pollution Control Act as amended in 1972. Approval of these projects was certified by the State of Florida by including them within the project priority list for fiscal year 1973 and 1974 funds pursuant to federal regulation 40 C.F.R. § 35.915. Approximately $14 million of fiscal year 1973 funds were earmarked by priority list for Central Dade; additional federal funds for fiscal year 1974 amounting to

about $73 million were earmarked for the three projects. Both project priority lists were subsequently approved by EPA. Fiscal year 1973 and fiscal year 1974 lists were consolidated by action of the Florida Pollution Control Board on April 2, 1974.

10. At present Dade County is the number one polluter within the entire eight state southeastern EPA region. Every day Dade County discharges through three ocean outfall lines approximately 94 million gallons of sewage into the Atlantic Ocean at depths as low as 18 feet below the surface. Of this total amount of sewage, approximately 22 million gallons per day consist of completely raw sewage, while some 25 million gallons per day are only "skimmed" of "floatable solids".

11. The environmental impact statements, the Water Quality Management Plan and Environmental Assessment of the Water Quality Management Plan recommend substantially the following treatment systems for the three segments of Dade County:

(A) *North Dade*—construction of a new area-wide secondary treatment plant capable of handling 80 million gallons of sewage per day and providing 90% removal of suspended solids and biochemical oxygen demand, to be located on an 80-acre site within the Interama tract [2] of North Miami, Florida; treated effluent is to be discharged through a new ocean outfall beyond the seaward reef to a point approximately 3 miles from shore, 90 feet below the surface of the ocean; sludge will be pumped to Virginia Key for further treatment and reuse by land application.

(B) *Central Dade*—upgrading of the existing Virginia Key sewage plant and construction of a new secondary plant resulting in a total capacity of 115 million gallons per day with 90% removal; the existing ocean outfall would be ex-tended and enlarged; sludge will be treated at Virginia Key together with and in the same manner as that from North Dade.

(C) *South Dade*—construction of a 50 million gallons per day area-wide secondary treatment plant replacing nine smaller plants; treated effluent will be discharged by injection in deep wells within the "boulder zone" of the Florida Aquifer; sludge will be treated and disposed of as land fill or soil conditioner.

12. Having reviewed the environmental impact statements filed in this cause, the Court finds that the federal defendants adequately studied the potential adverse environmental effects of the proposed ocean disposal of secondary treated effluent, as well as the potential adverse impact of deep well disposal of treated wastes.

13. Similarly, the following alternatives to deep well and ocean disposal were adequately considered:

(a) Discharge into the canals and intracoastal waterway;

(b) Land disposal;

(c) Septic tank disposal;

(d) Shallow well disposal;

(e) Discharge to the Florida Everglades;

(f) Advanced or tertiary waste treatment;

(g) Use of recycled effluent in connection with cooling of power plants;

(h) No action.

14. The alternative of land disposal itself received approximately 123 pages of discussion of its varying aspects within the four Environmental Impact Statements, and reference materials for the discussion indicated sixty-five (65) technical works and publications of experts in various technical disciplines. The Environmental Impact Statements revealed that the land disposal alterna-

---

2. In June of 1971, Dade County agreed to purchase this 80-acre tract at the Interama site. However, the contracts constituting that agreement provided that all contractual commitments were completely contingent on final plan approval by the reviewing agencies.

tive was rejected for Dade County, Florida, due to the following factors:

(a) The high water table and porosity of the soil;

(b) The large land area required (12,000–15,000 acres for 80 million gallons per day); and associated high costs of land acquisition;

(c) The occurrence of sudden large rainfalls;

(d) The high salt content of the wastewater;

(e) The secondary effects of draining large areas of wetlands adjacent to the Everglades and conservation areas;

(f) The need for large storage areas for periods when additional water and nitrogen cannot be taken up by the crops;

(g) The need for a "safety valve" in any event to accommodate large quantities of wastewater during periods of malfunction;

(h) The advisability of secondary treatment in any event prior to pumping effluent to western areas for recharge and reuse; and

(i) The adaptability of secondary treatment to upgrading to future advanced waste treatment or land application;

(j) Possible public health hazard of such a system.

15. The Environmental Impact Statements also specifically directed comments to the views of Dr. John R. Sheaffer, a proponent of the land disposal alternative, as well as local advocate of this alternative. (Disposal Methods EIS at 287–291, 306–308, 330–331, 334–335, 341, F1; North Dade EIS at 191–199, 310–312)

16. The four Environmental Impact Statements filed in this cause reflect written comments and responses thereto on the significant facets of the Master Plan for Dade County and alternative proposals as well.[3]

## CONCLUSIONS OF LAW

1. The Court has jurisdiction pursuant to the following federal laws: 5 U.S.C. §§ 701–706 (Administrative Procedure Act); 28 U.S.C. § 1331(a) (Federal Question); 28 U.S.C. §§ 2201–2202 (Declaratory Judgment); 28 U.S.C. § 1361 (mandamus); 42 U.S.C. § 4321 et seq. (NEPA) and 33 U.S.C. § 1151 et seq. (The Federal Water Pollution Control Act). The amount in controversy exceeds $10,000 exclusive of interest, costs and attorneys' fees.

2. Plaintiff claims that the environmental impact statements prepared by the EPA in connection with the North Dade project ("Ocean Outfalls and Other Methods of Treated Wastewater Disposal in Southeast Florida", hereinafter "Disposal Methods EIS", and "Final Environmental Impact Statement, North Dade County, Florida", hereinafter "North Dade EIS") are inadequate in that certain alternatives to ocean disposal of treated waste, particularly land application, were not explored in sufficient detail.[4] Plaintiff further alleges that the statements and other documents and deposition testimony of federal officials evince a "predisposition" against land application and in favor of ocean disposal which runs contrary to the intent of NEPA. Finally, plaintiff contends that Russell Train, the Administrator of the Environmental Protection Agency, has failed to "encourage" the use of alternative waste treatment sys-

---

3. In its "Opposition to Federal Defendants' Statement of Material Facts," plaintiff raises the issue whether the federal defendants properly considered all comments offered by the public and federal, state, and local agencies, as required by EPA regulations. (See, *inter alia*, 40 C.F.R. § 6.36(g)) The inclusion of each and every comment made, and a response thereto, is not always required under NEPA, however. See, Committee for Nuclear Responsibility v. Seaborg, 149 U.S.App.D.C. 380, 463 F.2d 783 (1971); cf., Portland Cement Association v. Ruckelshaus, 158 U.S.App.D.C. 308, 486 F.2d 375 (1973).

4. Similar contentions are made with respect to the South Dade and Central Dade projects although clearly the focus of plaintiff's attack is the facility to be located within its own boundaries.

tems involving land application and wastewater reuse as required by Section 201 of the Federal Water Pollution Control Act, 33 U.S.C. § 1281.

Defendants, on the other hand, contend that the environmental impact statements prepared by the EPA satisfy all the requirements of NEPA as interpreted by the courts and furthermore, that a decision to fund the proposed projects cannot and should not be enjoined by this Court under the standard of review permitted of substantive agency decision.

■ 3. The standard of judicial review under NEPA of an EPA decision to fund or embark upon a particular project is limited to whether the decision is arbitrary, capricious or an abuse of discretion. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The Fifth Circuit Court of Appeals recently pointed out in Environmental Defense Fund, Inc. v. Corp. of Engineers, 492 F.2d 1123, 1138, 1139 (5th Cir. 1974), that while substantive review of agency decisions is required, that review is "limited" and exceedingly "narrow". The Court noted that it is not empowered to substitute its judgment for that of the agency. On the contrary:

"[I]ts function is only to assure that the (Impact) statement sets forth the opposing scientific views, and does not take the arbitrary and impermissible approach of completely omitting from the statement, and hence from the focus that the statement was intended to provide for the deciding officials, any reference whatever to the existence of responsible scientific opinions concerning possible environmental effects." Committee for Nuclear Responsibility v. Seaborg, 149 U.S.App.D.C. 380, 463 F.2d 783, 787 (1971)

It is further clear that:

"So long as the officials or agencies have taken a 'hard look' at environmental consequences mandated by Congress, the court does not seek to

. . . inject itself within the area of discretion of the executive as to the choice of action to be taken." NRDC v. Morton, (1971), 148 U.S.App.D.C. 5, 458 F.2d 827, 838.

With these principles as a guide the Court examines the impact statements and the procedures followed by defendants in preparing them.

■ 4. The four Environmental Impact Statements are, on their face, both complete and detailed. Source materials relied upon are extensive and referenced. Competing points of view are discussed in the statement and the agency's assessment, in cases of divergent views, is fully articulated. It is also clear that EPA took the required "hard look" at the alternatives to the master plan including "the principal focus of Plaintiff's concern", "recycling alternatives to ocean disposal and deepwell injection".

■ The requirement of NEPA "to study, develop and describe appropriate alternatives to recommended courses of action" has been fully and extensively met in a detailed manner. 42 U.S.C. § 4332(2)(D). This requirement has not been construed as being an unbending standard. The courts have noted that the discussion of environmental effects of alternatives need not be exhaustive, but must only permit a reasonable choice of alternatives so far as environmental aspects are concerned. Natural Resources Defense Council, Inc. v. Morton, supra.

The "Disposal Methods EIS" alone devoted one complete section of thirty-two (32) pages to the land disposal alternative for sewage effluent. Disposal Methods EIS at 209–241. That section of the EIS examined the (1) water quality goals effected by the proposal; (2) the various types of land disposal systems; (3) the comparative characteristics of the basic systems; (4) the environmental impacts of public health significance; (5) soil responses to the system; (6) vegetation responses; (7) the preliminary design of such a system; (8) the adverse impacts which could not

be avoided in the system; and (9) the irreversible and irretrievable commitments of resources implicit in such a system. Reference material for the section included sixty-five (65) technical works and publications of experts in various technical disciplines. [Disposal Methods EIS at 236–241.] The statement informed the reader of both the possible benefits and detriments of such systems. Rather than the "slanting" or "bias" alleged by plaintiff, the statement recognizes many of the benefits of such a system (Disposal Methods EIS at 221). However, there are many reasons advanced by the EPA for its decision to reject this alternative. These too are spelled out in considerable detail in the EIS.

Two reasons are particularly persuasive to the Court because neither could have been ignored by a responsible decision maker. First, the potential public health danger in land disposal that is discussed by Dr. Flora Welling, Administrator of the State of Florida Department of Health [North Dade EIS at 275].

"In summary then, I do believe that using secondary wastewater for spray irrigation, except under rigidly controlled conditions, is a threat to public health not only through aerosol infection of man but also through virus contamination of the aquifer. Therefore, only virus free wastewater effluents should be used for spray irrigation with careful monitoring of the treatment system. If even minor breakdowns should occur, an alternative disposal method, preferably an outfall pipe into the Gulf, should be available.

"As additional research results become available, hopefully, more definitive answers will be forthcoming. However, until that time, we must approach wastewater spray irrigation very cautiously in my opinion."

Second, the huge land area required for plaintiff's proposed system and the astronomical cost of such land. Even plaintiff's expert, Dr. Sheaffer, indicated that 48,000 acres of land might be required for a county-wide system and 15,000 acres would be required for North Dade County alone. The cost of land alone would be $288 million dollars or double the entire project's present projected cost. In addition, the Administrator of EPA had to consider many other facts generally adverse to plaintiff's system, including:

(a) The separation of high saline waste waters from coastal areas from the fresher waste water from the western areas;

(b) The utilization of existing farm land, including either direct governmental control through purchase or condemnation or legal controls over private enterprise farm practices;

(c) The conversion of undeveloped land;

(d) The replacement of natural vegetation with year-round harvestable crops which cannot be used for direct human consumption;

(e) The provisions for disposal of the natural vegetation and harvested crop in such a manner as not to violate water or air quality standards;

(f) The control of the water table to permit hydraulic loading and survival of the cover crop;

(g) The conversion of wet-lands to dry-lands to prevent ground water contamination;

(h) The provisions for storage of excess waste water during wet seasons and harvest times;

(i) The provisions for disposal of excess reclaimed irrigation water;

(j) The need to discharge to stream irrigation drainage pumped from the area;

(k) The problem of harvesting and disposing of the crops grown on the land;

(l) The probable need for the county to own and operate a farm;

(m) The irrigation scheme would be far more expensive to construct and op-

erate than the disposal systems recommended in the Plan;

(n) The necessity of pumping effluent long distances to get land of sufficient area and reasonable cost.

Each of these factors is discussed at length in the EIS. They provide sound support for the EPA's decision.

After an exhaustive examination of the land disposal alternative, the statements summarized the findings of the agency: (Disposal Methods EIS at 14–16, North Dade EIS at 215–217)

"Land disposal of treated wastewater can provide additional water purification (after waste treatment), conserve freshwater, and utilize nutrients and other constituents for productive purposes when applied to crops. Studies on the health risks of land disposal indicate a continuing concern, while still drawing the general conclusion that it is safe and acceptable if soil, hydrologic, and climatic conditions are favorable. However, this method of waste water disposal has limited applications in Southeast Florida because of the high ground water table and the unsuitability of the soil of some available unurbanized land."

The facts concerning these and other problems of such a system convince the Court that the decision of the Administrator of EPA was neither arbitrary nor capricious and did not constitute an abuse of discretion since it was based upon a "record upon which a decision maker could arrive at an informed decision". Environmental Defense Fund, Inc. v. Corps of Engineers of the United States Army, 342 F.Supp. 1211 (E.D. Ark.1972), aff'd, 470 F.2d 289 (8th Cir.), cert. denied, 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 160 (1973). Moreover, the Court believes that the four Environmental Impact Statements prepared

by EPA herein sufficiently "alert the public, other interested agencies, the Council of Environmental Quality, the President and the Congress of possible environmental consequences of proposed agency action". Sierra Club v. Froehlke, 486 F.2d 946 (7th Cir. 1973). This the Court believes, sufficiently meets the requirements of NEPA "to the fullest extent possible."

■ Further, the EPA was entitled to reject land application on the basis of the overriding environmental factors noted above [5] without performing detailed on-site surveys. A statement of this principle is found in Cape Henry Bird Club v. Laird, 359 F.Supp. 404, 421 (W.D.Va.1973), aff'd, 484 F.2d 453 (4th Cir. 1973):

"NEPA, however, does not require mass studies and compilations and computations of data for an alternative, the feasibility of which could be determined after only minor study. While the plaintiffs desire detailed studies and collections of such data, the court believes that the Corps need collect only as much data as will be necessary for the Corps to determine that the alternative is either infeasible or warrants further attention. NEPA does not preclude an agency from relying on past experience, judgment, and knowledge of the area when it makes a determination about the feasibility of a project's alternatives." Cape Henry Bird Club, supra, at 421–422.

5. Plaintiff has filed controverting affidavits in an attempt to raise issues of fact to defeat summary judgment in favor of the federal defendants. Plaintiff specifically contests the following opinions of the defendants' experts:

(1) Discharges from septic tanks, package treatment plants and ocean out-

---

5. There was also no doubt that the costs associated with full-scale land application would be enormous and that such a system would not meet the requirement that it be the "most cost efficient alternative". 33 U. S.C. § 1292(2)(B).

falls presently threaten the health and welfare of citizens of Dade County in total loadings of contaminants to the ocean;

(2) Major reductions in total loadings of contaminants to the ocean, considering future growth, will be accomplished;

(3) Implementation of the proposed system will largely eliminate the present threats to the nearshore coastal waters;

(4) Extension of ocean outfalls will enable more rapid assimilation of discharge by the action of the Florida current of the Gulf Stream.

■ It is not this Court's function to intervene in battles between experts, or to "rule on the relative merits of competing scientific opinion" but rather only:

"to assure that the statement sets forth the opposing scientific views, and does not take the arbitrary and impermissible approach of completely omitting from the statement, and hence from the focus that the statement was intended to provide for the deciding officials, any reference whatever to the existence of responsible scientific opinions concerning possible adverse environmental effects." Committee for Nuclear Responsibility v. Seaborg, *supra*, at 787.

Therefore, the conflicting points of scientific opinion are not material issues of fact before this Court.

■ 6. Plaintiff cites the acquisition of the Interama site by Dade County as evidence that the federal agency was predisposed against land application and in favor of ocean disposal prior to the EIS preparation. The site acquisition does not constitute a significant federal action before which there must be full compliance with Section 102 of NEPA. The Interama site was a large block of land well situated for a secondary sewage treatment plant and subject to adaptation to either advanced waste treatment or land application; it was chosen for a number of reasons noted above. (See North Dade EIS at 136–146, response to comment 5 at 196) The courts have held that the fact that certain actions were taken prior to the EIS is not a fatal error. See, *e. g.,* Jicarilla Apache Tribe v. Morton, 471 F.2d 1275 (9th Cir. 1973). Further, the County's contractual commitment for the purchase is expressly conditioned on ultimate federal approval.

7. In this case, over 1,700 pages have been printed and filed concerning the environmental impact of the three major "anti-pollution" facilities. The court in Maryland National Capitol Planning Commission v. Schulz, 5 E.R.C. 1340, 1343 (D.C.D.C.1973), makes an important point:

"The plaintiffs have ably dissected the statement and have directed their attack to many of the conclusions reached therein and, because the conclusions are not to their liking, have suggested that the statement is in the nature of an 'after the fact rationalization' rather than a good faith effort at weighing the various environmental consequences. That the plaintiffs do disagree with some of the conclusions comes as no surprise. On the contrary it would be surprising if any concerned party could concur fully in all the conclusions reached in a document comprising more than 300 pages requiring subjective assessments of each problem involved. That, however, is hardly ground to disregard the pro and con discussions in the statement of the various issues involved in the project. It is certainly not grounds for assuming that the subjective conclusions are merely after-the-fact rationalizations. In the eyes of many proponents of various points of view which have been downgraded or discarded in an impact statement that statement may well seem to be imperfect, but '[I]t is doubtful that any agency, however

objective, however sincere, however well-staffed, and however well-financed, could come up with a perfect environmental impact statement in connection with any major project.'"

Here, with a series of impact statements, the same point is even more noticeable.

8. The Court notes that the compliance with the master plan will enable Metropolitan Dade County to comply with the July 1, 1977, requirements of 33 U.S.C. § 1311(b)(1), the date by which all publicly owned treatment works must achieve secondary treatment. Metropolitan Dade County is also past the January 1, 1973, deadline provided in Section 403.086, Florida Statutes, F.S.A. for achieving secondary treatment by municipal treatment facilities. It is the Court's view that the EPA and the Intervenors have demonstrated with substantive competent evidence that the decision to fund the "anti-pollution" master plan was not arbitrary, capricious or an abuse of discretion. In sum, in the opinion of this Court, defendants have done to the fullest extent possible everything the NEPA and the WPCA require them to do before proceeding with the "major Federal action significantly affecting the environment". Accordingly, it is

Ordered and adjudged that:

1. The motions of defendants and defendant-intervenors for summary judgment be and the same are hereby granted. In the absence of a genuine dispute of material fact and defendants being entitled to a favorable judgment as a matter of law, summary final judgment is hereby entered in favor of defendants and defendant-intervenors and against the City of North Miami.

2. Plaintiff's Motion for Summary Judgment be and the same is hereby denied, there being no material facts in dispute as to defendants' compliance with the National Environmental Policy Act of 1969 or the Federal Water Pollution Control Amendments of 1972.