**CITY OF NEW HAVEN**

v.

**Russell E. TRAIN, Administrator, United States Environmental Protection Agency.**

**Civ. No. N–74–71.**

United States District Court,
D. Connecticut.

Nov. 2, 1976.

---

Henry L. Fisher, Thayer Baldwin, Corp. Counsel, New Haven, Conn., George C. Hastings, Hartford, Conn., for plaintiff.

Lloyd S. Guerci, Atty., Land and Natural Resources Div., Dept. of Justice, Washington, D.C., Marjorie Wilhelm, Asst. U.S. Atty., New Haven, Conn., for defendant.

## MEMORANDUM OF DECISION

NEWMAN, District Judge.

This lawsuit arises out of efforts by the plaintiff City of New Haven to secure fed-

eral funding from the defendant Administrator of the United States Environmental Protection Agency (APA) to construct secondary sewage treatment facilities. Though no grant application has been formally submitted and hence not yet rejected, plaintiff alleges, and defendant does not dispute, that APA has sufficiently given an informal indication of disapproval of the City's proposal to make the agency's action reviewable pursuant to the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* Whether the APA provides an independent source of federal jurisdiction has not been authoritatively resolved by the Second Circuit, see *Connecticut Union of Welfare Employees v. White*, 357 F.Supp. 1378 (D.Conn. 1973), but an affirmative answer has been accepted in this District. *Schicke v. United States*, 346 F.Supp. 417 (D.Conn.1971), *modified without consideration of this point*, 474 F.2d 309 (2d Cir. 1973). Jurisdiction is also invoked under 28 U.S.C. §§ 1331 and 1361.

The City currently maintains three primary sewage treatment facilities, at locations known as East Shore, East Street, and Boulevard. In 1967, the State of Connecticut ordered the City to provide secondary sewage treatment for the discharge of effluent from these primary plants, either by reconstructing these facilities as secondary facilities or pumping the effluent to secondary facilities located elsewhere. A secondary treatment plant is to be built at East Shore and is not part of the current controversy. What is in dispute is the location of a facility or facilities to provide secondary treatment for effluent from the East Street and Boulevard primary treatment plants. Of several possible plans prepared by consulting engineers, the City prefers so-called Scheme 2, which calls for the construction of a secondary treatment facility at the Boulevard site to handle effluent from this site and effluent pumped there from the East Street site. The City especially prefers this plan to Scheme 3, which in essence is the converse of Scheme 2. Under Scheme 3 a secondary treatment plant would be built at the East Street site and partially treated effluent from the Boulevard site would be pumped to the East Street site. The major concern of the City in preferring Scheme 2 is that it leaves available for industrial use prime land at the East Street site in what is known as the Long Wharf Redevelopment Area. Use of this land for a secondary sewage treatment plant, the City contends, will cost it large sums in foregone tax revenues and will seriously interfere with optimum land use planning.

In 1973 and 1974, EPA expressed its view that Scheme 2 (the Boulevard plan) would not be approved because it would be more costly to construct than Scheme 3 (the East Street plan). A principal element of the increased cost stems from the need, if the Boulevard site is used, to fill several acres of tidal flats in New Haven Harbor, a task that would require construction of a large bulkhead in the harbor. EPA also expressed concern that filling the tidal flats would have adverse ecological effects. The agency's views were outlined preliminarily in a letter dated June 8, 1973, from EPA's deputy regional administrator at Boston to the City, and confirmed more authoritatively in a letter dated January 21, 1974, from the defendant Administrator to the State's senior senator and to the congressman from the New Haven area district.

This suit was filed April 1, 1974, challenging on numerous grounds EPA's rejection of the Boulevard site in preference to the East Street site. After discussions with counsel, the Court attempted to narrow for trial what seemed to be the salient issues. What resulted was an informal severance of issues, cf. Fed.R.Civ.P. 42(a), with both sides given leave to pursue additional issues if they were so advised following determination of the initial questions. A bench trial ensued, concerned essentially with plaintiff's claims (a) that EPA had violated statutory limitations in interfering with the City's choice of a preferred site, (b) that even if cost effectiveness considerations could be applied by EPA to weigh the merits of one site over another, the agency had not properly applied its own guidelines in making the determination that East Street was more cost effective than Boulevard,

and (c) that in any event EPA was estopped from disapproving Boulevard as a proper site.

## I

Plaintiff's statutory argument challenges the Administrator's authority to disapprove a site as being contrary to both the general scheme of the Act and the specific language of 33 U.S.C. § 1292 defining "treatment works" and requiring cost effectiveness data.

The Federal Water Pollution Control Act of 1972 (33 U.S.C. § 1251 *et seq.*) [the Act] established a comprehensive scheme "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Among the steps taken by Congress to achieve this goal was the funding of a grant program for the construction of treatment works by state, municipal, intermunicipal and interstate agencies. 33 U.S.C. § 1281 *et seq.* The Administrator of EPA is empowered by 33 U.S.C. § 1281(g)(1) to make grants to any such agency for the construction of publicly owned treatment works.

Congress authorized construction grants for the building of treatment works and in 33 U.S.C. § 1285 provided a formula for the allotment of funds to individual states. For a treatment works project to receive funding, 33 U.S.C. § 1284(a)(3) requires, *inter alia*, that the project be one entitled to priority under an applicable state plan. Such a regional or state plan must be submitted by each individual state to the Administrator, 33 U.S.C. § 1313(e)(2); and 33 U.S.C. § 1313(e)(3) provides that the Administrator "shall approve" such a submitted plan "which will result in plans for all navigable waters within" a state. Section 1313(e)(3) further lists a number of specifics to be contained within the state plan, among which is "an inventory and ranking, in order of priority, of needs for construction of waste treatment works required to meet the applicable requirements of §§ 1311 and 1312 of this title." 33 U.S.C. § 1313(e)(3)(H).

The City contends that all of this statutory language was designed to establish the following scheme: each state is to receive a sum certain from EPA, and the state is free to expend this sum in accordance with the priorities established in its own plan, which EPA must approve if it meets Congressional objectives. If part of the state plan provides for the construction of a waste treatment plant at a site where site preparation costs are higher than at another site, the City argues that the EPA Administrator may not veto the construction of such a plant, provided that the total costs of all projects approved for construction in a state do not exceed the amount of funds allotted the state under 33 U.S.C. § 1285.

Plaintiff reads too much into the provisions of 33 U.S.C. § 1313(e)(3) when it maintains that this section prohibits the Administrator from considering site preparation costs in determining grant eligibility. Much is made of the mandatory language contained within this subsection. However, 33 U.S.C. § 1313(e)(2) states that "The Administrator shall from time to time review each State's approved planning process for the purpose of insuring that such planning process is at all times consistent with this chapter." Thus Congress obviously contemplated that the Administrator would exercise continuing supervision over the states' planning processes, and therefore must have intended the Administrator to have the continuing power to reject those planning processes found not to be consistent with the Act.

More significantly, the mandate of § 1313(e)(3), that the "Administrator shall approve any continuing planning process submitted to him . . . which will result in plans for all navigable waters within such State," is not intended to require the Administrator to approve any specific site selection for a specific waste treatment plant. In enacting § 1313 Congress was concerned with establishing a continuing overview process whereby the states would monitor and control water quality standards. The "planning process" described in § 1313 is the institutional mechanism by

which such broad standards for a state would be established. The Administrator is required only to approve the process, not the specific plans that the process produces. As to any specific waste treatment plant, priority in the state plan is a *necessary* but not a *sufficient* condition for federal funding under the Act.

This view of § 1313 is bolstered by reference to § 1283, which requires "each applicant for a grant" to submit "to the Administrator for his approval, plans, specifications, and *estimates* for each proposed project for the construction of treatment works for which a grant is applied for under section 1281(g)(1) of this title from funds allotted to the State under section 1285 of this title . . . ." (Emphasis added). If approval of the planning process under § 1313—which was required to have taken place within 150 days after the passage of the Act—had been designed to vest rights in the states or localities as to specific sites in accordance with the construction priorities contained within the planning process, § 1283(a) would be both superfluous and contradictory. Congress intended that the Administrator scrutinize the plans for each specific waste treatment plant. The use of the term "estimates" in § 1283 can reasonably refer only to cost estimates.

The cost estimates required by § 1283 are for the "construction" of a waste treatment plant. "Construction" is defined expansively in § 1292(1) and includes, *inter alia*, "other necessary actions, erection, building, acquisition, alteration . . . of treatment works." Sight development costs may—as is evidenced by the present litigation—represent one of the most variable components of the cost of construction of a waste treatment plant. The Act requires the submission of cost estimates for virtually every endeavor related to waste treatment plant construction. It is doubtful that Congress intended to exclude such a vital component of cost analysis from the Administrator's review.

The more specific statutory argument focuses on the provisions of 33 U.S.C.

§ 1292(2) defining "treatment works." Subparagraph (A) defines "treatment works" to include "any devices and systems used in the . . . treatment . . . of municipal sewage," and there is no dispute that the City's proposal meets this definition. Subparagraph (B) expands the definition of "treatment works" by providing in its first sentence:

> In addition to the definition contained in subparagraph (A) of this paragraph, "treatment works" means any other method or system for preventing, abating, reducing, storing, treating, separating, or disposing of municipal waste, including storm water runoff, or industrial waste, including waste in combined storm water and sanitary sewer systems.

The second sentence of subparagraph (B) requires the submission of data demonstrating cost effectiveness:

> Any application for construction grants which includes wholly or in part such methods or systems shall, in accordance with guidelines published by the Administrator pursuant to subparagraph (C) of this paragraph, contain adequate data and analysis demonstrating such proposal to be, over the life of such works, the most cost efficient alternative to comply with sections 1311 or 1312 of this title, or the requirements of section 1281 of this title.

The City contends that only those "treatment works" that fall within the categories enumerated in § 1292(2)(B) may properly be subjected to a cost analysis pursuant to regulations promulgated by EPA under § 1292(2)(C). It argues that the secondary treatment plant it intends to build (whether at the Boulevard or East Street site) is of a type defined in § 1292(2)(A) and thus is not subject to the Administrator's cost analysis under the § 1292(2)(C) regulations.

Congress expanded the definition of "treatment works" in § 1292(2)(B) to make clear that combined sewer systems would qualify for funding under the Act when the construction of such systems would be less expensive than the construction of waste

treatment plants.[1] Section 1292(2)(B) provides that information demonstrating such a system to be the most cost efficient alternative accompany an application for a grant simply because Congress was concerned that the funds available under the Act not be used to rectify all local sewer systems, but only those whose improvement would be the least expensive manner of furthering the purposes of the Act.

 It may be that the cost analysis guidelines authorized by § 1292(2)(C) are required to be applied only to requests for funding of projects described in § 1292(2)(B).[2] However, it does not follow that the Administrator is prohibited from applying them to a § 1292(2)(A) treatment works. The preceding analysis of 33 U.S.C. §§ 1283 and 1313 indicates that such an inquiry is entirely appropriate. Indeed, it would be an unusual federally funded program that would preclude an administrator from applying cost effectiveness analysis in the distribution of public monies. The Senate Committee's report on the 1972 amendments to the Act specifically emphasized the Congressional concern "to maximize the return on the public tax dollar." U.S.Code

Cong. & Admin.News, p. 3690 (1972). Moreover, 33 U.S.C. § 1361 authorizes the Administrator to "prescribe such regulations as are necessary to carry out his functions under this chapter." Since cost effectiveness analysis is a proper function for the Administrator to perform in administering the Act, regulations may be promulgated under the authority of § 1361 to guide that analysis.

## II

The City's most persuasive contention is that cost effectiveness analysis, even if authorized for consideration of whether one site is to be rejected in favor of another, was done by EPA in an arbitrary manner, in violation of the agency's own regulations. EPA proposed cost effectiveness analysis guidelines on July 3, 1973, 38 Fed.Reg. 17736, and promulgated them on September 10, 1973, 38 Fed.Reg. 24639. They are set forth in 40 C.F.R. Part 35, Appx. A. EPA concedes that these guidelines set forth the standards that are to be used and claims that they were in fact used in reaching the conclusion that the Boulevard site was less cost effective than the East Street site.

1. During the Senate debate surrounding the Act, Senator Magnuson stated as follows:

 I am especially pleased that the Public Works Committee included the concept that projects for which reimbursement was to be made available included not only those that received some Federal funds, but also those that received absolutely no Federal contribution but which by their nature were eligible for Federal contributions under the earlier legislation. This feature is of special concern to Seattle and other cities where combined storm and sanitary sewer systems required modification to make more reasonable and meaningful the construction of water treatment facilities. . . .
 This feature of the reimbursement provision is consistent with and is reinforced by the additional definition of "treatment works" contained in the committee bill—section 210(b)(2)—which expressly directs the Administrator of EPA to include facilities for the elimination or abatement of overflows from combined storm and sanitary sewer systems . . . It is my understanding that it was not the intention of the committee to embark on a national program to rectify all combined sewer systems that exist in the country, but rather to establish the principle

that where construction of facilities to handle such overflows was the most efficient, economical, rational, and reasonable approach to the particular community's water pollution problem, it should be as much entitled to Federal contributions as any other water treatment facility.
117 Cong.Rec. 38850–51 (Nov. 2, 1971). See also S.Rep.No.92–414, 92d Cong., 1st Sess. 40–41 (1971), U.S.Code Cong. & Admin.News 1972, p. 3668.

2. While the statute would seem to contemplate this result, it is worth noting that during the course of the House Committee hearings, the EPA evaluated subsection (C) as providing "for the publication of guidelines for the evaluation of methods of waste treatment." H.R.Rep.No. 92–911, 92d Cong., 2d Sess. 155 (1971). This general language seems to contemplate an EPA inquiry pursuant to subsection (2)(C) in virtually all applications. One court has commented upon what appears to be a subsection (2)(A) project in terms that seem to apply the cost efficiency analysis of subsections (2)(B) and (2)(C). *City of Miami, Florida v. Train*, 377 F.Supp. 1264, 1272 n. 5 (S.D.Fla.1974).

Paragraph c. of the guidelines makes clear that they apply to the development of plans for and the selection of component parts of a waste treatment management system. Paragraph f. of the guidelines provides: "The most cost effective alternative shall be the waste treatment management system determined from the analysis to have the lowest present worth and/or equivalent annual value without overriding nonmonetary costs and to realize at least identical minimum benefits in terms of applicable Federal, State, and local standards for effluent quality, water quality, water reuse and/or land and subsurface disposal." Paragraph f. also specifies that nonmonetary factors, which are described by way of illustration as "social" and "environmental," "shall be accounted for descriptively in the analysis in order to determine their significance and impact." The procedure contemplated by the guidelines and explained by Clifford V. Smith, EPA's deputy regional administrator at Boston with authority for the New Haven project, is clear. The agency calculates the monetary costs of the various alternatives. It then must make a subjective judgment as to whether these costs are overridden by nonmonetary costs attributable to environmental damage, adverse social consequences, or other factors to which dollar values are not readily assignable.

The evidence disclosed that the monetary costs to be incurred by site development and construction at East Street would be less than at Boulevard. The difference by one set of estimates would be $6 million. The City contends that this differential is outweighed by the nonmonetary costs associated with the use of East Street as the site for a secondary sewage treatment facility. The City emphasizes the need to maintain the land at East Street available for industrial development, since this land is among the last locations the City has for industrial development. It is located in the Long Wharf Redevelopment Area, a project that has been a source of major attention by local, state, and federal governments. While one aspect of the "nonmonetary" costs emphasized by the City, foregone tax

revenues if East Street land is used for a secondary sewage treatment plant instead of industrial development, is capable of measurement in dollars, albeit with some considerable estimating, the City is not contending that the foregone tax revenues should simply be subtracted from the costs of constructing at Boulevard (or added to the cost of constructing at East Street). Instead the City contends that there must take place within the EPA a good-faith, reasoned determination as to whether the adverse social consequences of using the East Street site are so significant that they can fairly be said to "override" the dollar cost benefit of that site. In other words, the City agrees it is a matter of judgment, not merely of arithmetic. EPA asserts it has made the necessary judgment and determined that the social costs do not "override" the monetary costs to be saved by construction at East Street.

If the issue for this Court were whether a judgment, properly made by the agency, was supported by sufficient evidence to render it not arbitrary or capricious, see *Friends of the Earth v. United States Environmental Protection Agency,* 499 F.2d 1118, 1123 (2d Cir. 1974), the agency's action could not be disturbed. But the evidence from the EPA officials establishes that the judgment called for by the guidelines was made by a procedure that is not recognized by the guidelines, one that is of the essence of arbitrary rather than reasoned decision-making. Smith testified that what actually happened was the application of a rule of thumb, which he said a man in his regional office had heard of from some unnamed person in Washington. According to this "rule," nonmonetary costs are never to be permitted to override a monetary cost saving whenever the differential between the monetary costs of two competing sites exceeds $500,000. While Smith testified that he gave some consideration to the adverse social costs of the East Street site, he candidly conceded that once it appeared that the monetary costs of the Boulevard site exceeded those of East Street by more than $500,000, he felt obliged to reject the Boule-

vard site, total costs of which exceeded $60 million.

Whether EPA could validly promulgate through rulemaking procedure an automatic rejection of nonmonetary costs whenever monetary cost differences exceed $500,000 need not be decided in this case. Surely it would ill become an agency charged with protection of the nation's environment to maintain as a matter of inflexible policy that environmental damage can never be so serious as to justify an extra expenditure of more than $500,000. Nor would such an approach be readily conceded to be appropriate in assessing adverse consequences to a community's orderly development of its scarce land resources, especially in light of the declared "policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States . . to plan the development and use . . . of land . . . resources . . . ." 33 U.S.C. § 1251(b). Whether or not the $500,000 "rule" could be promulgated, the pertinent fact for this litigation is that it has not been promulgated. *Cf. Morton v. Ruiz*, 415 U.S. 199, 232, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974). No other personnel of EPA except Smith testified to such a rule. It is not mentioned in the Administrator's letters explaining the agency's decision to Congress. Nor is it mentioned in any of the briefs submitted in support of the agency's action.

█ The guidelines call for the exercise of judgment in each instance in determining whether monetary cost differences are outweighed by nonmonetary costs. When administrators conclude that a site must be rejected because its monetary costs are more than $500,000 greater than an alternative and that a difference of this size cannot be overridden by any nonmonetary costs, they have failed to follow their own published guidelines, and the rejection of a site such as Boulevard under such an arbitrary procedure cannot be permitted to stand. The judgment to be made by the agency is not an easy one. Of course, it is properly concerned that public funds be spent prudently. At the same time, its regulations and the Congressional policy it

is charged to implement require that serious consideration be given to adverse social costs such as those that would be incurred by the City of New Haven if it were to locate a secondary sewage treatment facility on a substantial portion of the prime industrial land available in the Long Wharf Redevelopment Area. In an appropriate case, the implementation of a federal program that involves as high a degree of federal-state-local cooperation as does the water pollution control program may well warrant placement of a facility at a more expensive site in order to serve the larger social needs of an entire community. Ultimately that judgment is for the agency empowered to dispense the funds. But under the present regulations it must make that judgment upon a careful consideration of the true significance of the nonmonetary costs, unfettered by an arbitrary unpublished rule which, unbeknown to the applicant or to the Congress, dictates that at certain levels of monetary costs differences, the nonmonetary costs are never to be permitted to prevail.

### III

Beyond challenging the Administrator's authority to reject a site on cost considerations and the procedure by which the decision to reject was made, the City contends that on the facts of this case the Administrator is estopped from rejecting the Boulevard site. It is important to specify precisely what the City is contending. It does not assert that the Administrator is committed to approving a construction grant for the Boulevard site. Rather the claim is that agency action and City reliance thereon have created an estoppel that prohibits rejection of the Boulevard site, with the result that an application for construction at that site could be rejected only on grounds other than those related to the consequences, cost and others, of construction at that site. Not in issue in this litigation is whether the Administrator is obliged to pay for the expenses of planning for construction at the Boulevard site. The Administrator contends, with considerable

**656**

force, that even if an estoppel had arisen, at most it would require federal payment of these planning costs, or at least that portion incurred after the estoppel had arisen, but would not in any event preclude rejection of a grant application because of the higher costs of construction at the Boulevard site. *Cf. United States v. Wharton,* 514 F.2d 406 (9th Cir. 1975).

■ Whether or not the Government could be estopped in a case such as this, *cf. Federal Crop Insurance Corp. v. Merrill,* 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947), the facts of this case do not in any event establish an estoppel.[3] The core of plaintiff's estoppel contentions is correspondence from EPA to the Connecticut Department of Environmental Protection, the state agency with responsibility for implementation of water quality control standards. These letters were sent on December 8, 1972, and January 8, 1973, in reply to an inquiry from the state agency dated October 24, 1972. The State's letter wanted EPA's views as to whether certain site preparation costs at the Boulevard site concerning sewers and storm drains were eligible for federal reimbursement. It was understood that site preparation costs are generally eligible for federal reimbursement, but there was some uncertainty as to the particular costs to be incurred if the Boulevard site were used. EPA's December 8 response said that the Boulevard site "appears completely eligible," though the letter cautioned the state agency to "please consider this as our preliminary review." The January 8 response specifically referred to sewerage system eligibility, noting the broadened definition of "treatment works" under the 1972 amendments.

The City asserts it was entitled to consider these responses as a determination that the Boulevard site was acceptable to EPA. The Administrator contends that the correspondence indicated only that the work necessary to prepare the Boulevard site was within the category of site preparation work eligible for federal funds, but that this eligibility determination does not constitute approval of the site. While there is some ambiguity in the correspondence, the Administrator's contention is the more persuasive, especially in the context of the dealings between the parties. Specific issues had arisen as to eligibility of certain sewer costs. Moreover, the engineering plans outlining the alternative sites and their respective costs had not reached EPA until sometime in January, 1973. Thus, the December, 1972, letter could not properly have been understood as approving the Boulevard site as an acceptable alternative to the other, less costly sites, since EPA in December, 1972, did not have the information showing the comparative costs of the alternatives. Clearly, the strict standards for an estoppel, outlined in *United States v. Georgia-Pacific Corp.,* 421 F.2d 92 (9th Cir. 1970), have not been met.

■ Apart from this correspondence, the balance of the City's argument is essentially a claim that EPA knew the City preferred the Boulevard site, yet raised no objection until mid-1973. This argument, to whatever extent it can be factually supported, is unavailing, at least to estop EPA from disapproving the Boulevard site, as distinguished from failing to reimburse for planning expenses. Other than expend funds for planning, the City did not act in reliance on an assumed EPA approval of the Boulevard site.

\* \* \* \* \* \*

For the reasons stated in Part II of this decision, judgment may enter declaring that the Administrator's decision disapproving the Boulevard site was not made in conformity with agency guidelines, and is

---

**3.** When the issues were partially severed for trial, the Court indicated that with respect to the City's claim of estoppel, the parties would present evidence as to whether the elements of an estoppel were established. If they were, the parties would then be given a further opportunity to present evidence as to whether enforcement of an estoppel would be in the public interest. That issue would involve, among other things, environmental considerations. Since the elements of an estoppel are not established, it is unnecessary to go further and assess public interest considerations.

therefore set aside, without prejudice to further proceedings in conformity with this opinion.