**OAHE CONSERVANCY SUB–DISTRICT, a political Sub-division of the State of South Dakota, and the James River Flood Control Association, a non-incorporated South Dakota Association and the Tacoma Park Association, a South Dakota Corporation, Plaintiffs,**

v.

**Clifford L. ALEXANDER, Jr., Secretary of the Army, Lieutenant General John W. Morris, Chief of Engineers, Department of the Army, Colonel William Ray, District Engineer, Omaha District, Corps of Engineers, Defendants.**

**No. CIV78–1006.**

United States District Court, D. South Dakota, N. D.

May 1, 1978.

Tom P. May, Aberdeen, S. D., for plaintiffs.

Robert D. Hiaring, First Asst. U. S. Atty., Sioux Falls, S. D., and Gary D. Blair, Asst. Dist. Counsel, Omaha District, Corps of Engineers, Omaha, Neb., for defendants.

Murray G. Sagsveen, Asst. Atty. Gen., Bismarck, N. D., amicus curiae for the State of North Dakota.

## MEMORANDUM DECISION

NICHOL, Chief Judge.

Plaintiffs seek a preliminary injunction preventing the Corps of Engineers from discharging any water from the Jamestown and Pipestem Dams in North Dakota until such time as the flooding conditions along the James River in northern South Dakota are adequately alleviated. This matter was originally presented before the Court on April 12, 1978, at which time plaintiffs requested a temporary restraining order. At the conclusion of that hearing, the Court, while refusing to completely shut down the discharge of water from those dams as sought by plaintiffs, did grant a temporary restraining order restricting the release of water from the dams to 50 cubic feet per second or to such greater amount as that which equals the inflow of water to the two dam projects.

On April 21, 1978, a hearing was held on plaintiffs' application for a preliminary in-

junction. At that time the Court considered it inappropriate to decide the issue of an additional injunction without submission of legal memoranda by the parties and without the Court drafting a written decision. Therefore, the Court exercised its discretion by extending the temporary restraining order for an additional ten day period to permit the preparation and filing of this decision.

Plaintiff, Oahe Conservancy Sub-district, is a political subdivision of the state of South Dakota. It is organized and exists under South Dakota law, S.D.Comp.Laws Ann. 46–18, with the established purpose of developing desirable water resource projects for sixteen South Dakota counties. In pursuit of that general purpose the Subdistrict adopted the James River Resolution which provides a plan for the river's general improvement and its flood control.

Plaintiff, James River Flood Control Association, is a non-incorporated association organized under the laws of the state of South Dakota. Its purpose is to manage and control the river for the benefit of its members and all residents living along the James River in Brown and Spink Counties. Plaintiff, Tacoma Park Association, is a corporation organized under the laws of South Dakota for the development of a permanent community and recreational facilities on a certain area along the James River.

■ These plaintiffs allege that the actions of the Corps of Engineers in the management of the Pipestem and Jamestown Dams have adversely affected their management and control of local water projects and goals and have individually injured members of plaintiff organizations who reside on land along the flood-stricken James River. Plaintiffs seek relief in this court on the basis that defendants have failed to adequately promulgate regulations for the operation of the two dams and that in following the regulations that do exist in regard to the operation of the dams the Corps of Engineers has acted arbitrarily and capriciously. In both regards, plaintiffs have made an inadequate showing that they are entitled to relief and therefore the Court

feels compelled to deny the application for a preliminary injunction despite sharing concerns for the spring conditions faced by South Dakota citizens all along the James River. This spring's flood conditions with respect to the James River paint a sad and ugly esthetic and economic picture. Those facts alone, however, do not permit intervention by the federal courts in the administration of certain specified out-of-state dams by the Corps of Engineers.

A review of the evidence presented reveals the following: Due to an abnormally heavy snow cover during the winter of 1978, this spring has witnessed an extensive runoff into the descriptively narrow and winding James River. Beginning in late March of this year, severe flood conditions appeared along the James River in Brown and Spink Counties in northern South Dakota. In hopes such action could assist in alleviating the problem, representatives of the Oahe Conservancy Sub-district contacted the regional office of the Corps of Engineers in Omaha, Nebraska, requesting the Corps to close the flood gates to the Jamestown and Pipestem Dams in North Dakota until the flood conditions in South Dakota dissipate. The Corps refused to do so and as a result this litigation was initiated.

The James River begins its winding course in the middle eastern portion of North Dakota. It flows south through North Dakota and most of South Dakota before eventually emptying into the Missouri River. Along its course, the river passes Jamestown, North Dakota, a city with approximately 15,000 inhabitants. As the James River approaches Jamestown, the waters from Pipestem Creek empty into it. This is just north of the city. From Jamestown, the river winds south approximately eighty miles to the North Dakota-South Dakota border. It is about another thirty miles from that border to the start of the area involved in this litigation. Prior to reaching that area and just south of the North Dakota border, the river flows through the Sand Lake National Refuge.

This litigation primarily concerns the flooding problems near and just south of

Columbia, South Dakota. The channel capacity in this area is approximately 500 c.f.s. On April 20, 1978, the water level at Columbia was 14 feet 30 inches. At that time the level was falling. The flood stage at that point in the James River is eleven feet. From Jamestown, North Dakota, to Columbia, South Dakota, the water's journey down the James River is slow. It takes water from Pipestem Dam 2½ to 3 weeks to get to Columbia. The Sand Lake Refuge is partly responsible for slowing that water's journey. The lake under normal conditions provides certain flood protection benefits as it is naturally capable of storing a large amount of water. It is not so capable presently as it is flooded like numerous other areas along the James River.

Between Jamestown and Columbia the James River absorbs water from numerous other sources. It is also true that a portion of the water from Pipestem Dam is lost along the route. Only about five to ten percent of the water at Columbia actually came from Pipestem. Figures introduced by the Corps reflect that a release of 50 c.f.s. of water at Pipestem will raise the water level at Columbia four-tenths of a foot under normal conditions when the river is contained within its narrow banks. Otherwise, during flood conditions such as those presently persisting a 50 c.f.s. release has a two-tenths of a foot effect at Columbia. These figures do not take into consideration any loss of water from Jamestown to Columbia by seepage, evaporation or any other cause.

The two dams which the plaintiffs seek to close are the Jamestown Dam and the Pipestem Dam. The Jamestown Dam and Reservoir is located approximately one mile upstream from the intersection of the James River and Pipestem Creek. The dam is on the James River. The construction of the Jamestown Dam was authorized under the Flood Control Act of 1944. Construction began in 1953 and was completed the following year. The dam was built by the United States Bureau of Reclamation and that agency has retained jurisdiction over the use and management of the structure. The dam is part of the Corps of Engineers'

flood control system, however, in that once the reservoir pool level reaches the exclusive flood zone level, an elevation of 1440 feet, jurisdiction is taken over by the Corps of Engineers.

As required by the Flood Control Act of 1944, regulations with respect to the operation of the Jamestown Dam are published in the Code of Federal Regulations, 33 C.F.R. 208.50. No regulations with respect to the operation of the Pipestem Dam are recorded in C.F.R. or the Federal Register. The reason that such regulations are recorded for Jamestown Dam is that the law requires the publication in the Federal Register of the regulations for any reservoir constructed with flood storage capability that was built and is operated by someone other than the Corps of Engineers.

■ As stated, the Corps does not obtain jurisdiction over the Jamestown Dam until the reservoir level in that structure reached the established flood level of 1440 feet. This spring it has not reached that level. On April 12, 1978, the approximate water level was 1432 feet, about eight feet below the level in which the Corps obtains jurisdiction. It is therefore beyond the scope of any injunctive relief by this court. Plaintiffs have not disputed this, probably because the Jamestown Dam has not been releasing any water prior to, or during this litigation. This litigation therefore concerns the operation and the releases from Pipestem Dam, even though both dams are referred to in the pleadings. Both dams were presumably brought into the lawsuit because of the plaintiffs' recognition that they form a parallel flood control system. Once jurisdiction is obtained by the Corps over the Jamestown Dam, then the Corps must coordinate its releases from the two structures. Coordinated releases from the two dams by the Corps are determined according to a printed schedule which appears in a document entitled "Jamestown Dam and Reservoir Flood Control Regulation Procedures."

The other dam which is involved in this litigation is the Pipestem Dam and Reser-

voir. Construction of the dam was authorized under the Flood Control Act of 1965. Construction of the dam began in 1973 and was completed in July, 1974. Pipestem Dam is located on the Pipestem Creek and is located south of the Jamestown Dam. Both dams are independent of each other and the waters released by one does not empty into the other. However, the combined waters released by the two structures do commingle at the merging of the James River and Pipestem Creek, which is at a point north of the city of Jamestown. The Pipestem Dam is an earthfill structure. It rises some 99 feet above the stream bed and stretches some 4,000 feet in crest length from abutment to abutment. The dam contains a low flow outlet with a 36 inch capacity. In addition, it has a service outlet for flood control releases and an emergency spillway.

Pipestem Dam is exclusively a flood control structure and is under the sole jurisdiction and control of the Corps of Engineers. House Document 266 contains the basic information concerning the purpose behind and the justification for the construction of the Pipestem Dam project. The crux of the information is contained in the basic report of the District Engineer to the Division Engineer which is part of House Document 266. That report emphasizes the flood problem which the project is intended to address:

> The city of Jamestown lies partially within the flood plain at the confluence of Pipestem Creek and the James River. Jamestown Reservoir on the James River provides flood protection only against floods originating on the James River above the reservoir. Consequently, a severe flood problem still exists in Jamestown and along the James River between Jamestown and the North Dakota-South Dakota state line because of floods originating on Pipestem Creek. . . . Construction of a reservoir on Pipestem Creek near its mouth provides the only practicable and economically justified means for solution of this flood problem. House Document 266 at p. 37.

As House Document 266 reflects, the fundamental purpose and concern in the construction of Pipestem Dam was to provide an adequate flood control capability for the city of Jamestown and the areas downstream. The whole idea behind the dam project was to provide a means to capture a reasonable amount of runoff to protect Jamestown and the immediate area. The congressional directive to the Corps was that they look specifically at the flood problems at Jamestown and the immediate reaches downstream to the South Dakota border.

The Pipestem Dam is operated by the Corps in accordance with the "Pipestem Reservoir Regulation Manual." The operation of the dam is, therefore, made to conform with the congressional directives contained in House Document 266. This regulation manual was prepared in advance of any water storage operations by the dam. It defines the criteria for operation of the facility. In this manual, there are rule curves for reservoir operation which in effect direct a dam tender's regulation of the flow from the storage facility. While providing the necessary latitude required for dealing with climatic variations, the regulation manual sets reasonable operating parameters so that the dam can be regulated in a manner consistent with the congressional authorization and the planned design capabilities of the structure.

In accordance with the purpose of the dam and its design, it is necessary that the dam have adequate storage capacity to deal with any unexpected heavy runoff. This is particularly important in the spring when, as weather service data reflects, there is a far greater likelihood of heavy concentrated rainfall. The operating manual also reflects the Corps' constant concern about evacuating any excess water storage in the reservoir in order to minimize any possibility of an overtopping of the dam. Such an event could cause possible crevassing on the downstream side of the dam which could lead to a possible catastrophic failure of the embankment. Therefore, it becomes a necessary precaution in the operation of the

dam that the regulators insure that there is no excessive build-up of storage water in the flood control zone so as to preclude the handling of a subsequent flooding event which could raise the storage reservoir beyond the level which the dam could safely hold. The operating manual for the dam incorporates this concern into the release flow regulations.

The "Pipestem Reservoir Regulation Manual" also permits deviations by the Corps from its normal operating criteria in the limited emergency situations where downstream conditions warrant such actions. Paragraph 9–08 provides:

> Temporary deviations from the normal flood control plan may be made if conditions at the time are such that improved flood control will result. A factor for consideration in deviating from the normal plan (which is dependent only on reservoir elevations and flows at the Jamestown gauge) is the occurrence of substantial runoff downstream from Jamestown. At such time release reductions may be feasible in order to reduce damages downstream from the dam.

Pursuant to the above-cited provision the Corps has on occasion deviated from their prescribed releases from Pipestem Dam to help benefit flood problems downstream. In fact, in 1975, the Corps shut down the releases from Pipestem Dam for a period of 29 days to help alleviate flood problems in South Dakota. That deviation, however, occurred in late June which is a period of time when the likelihood of runoff problems above the dam due to heavy amounts of rainfall is significantly less.

Although plaintiffs claim that the Corps has acted in an arbitrary and capricious manner by not implementing the provisions of paragraph 9–08 in order to shut down the dam outflow, the facts are that the Corps has implemented that provision to aid the flood-stricken downstream area. According to the water level at Pipestem Reservoir on April 12, 1978, the Corps regulations permitted a release of 450 cubic feet per second from the dam. Not only was such a release in proper accordance with the

regulations, but it was also in accordance with the dam's objective of maintaining an adequate storage capacity for possible future runoff. However, even before this lawsuit was started, the Corps had reduced the outflow from Pipestem Dam to 50 c.f.s. in an attempt to assist the flood control efforts in South Dakota. Such action could hardly be labeled arbitrary and capricious. The Corps, however, maintains that a continued minimal outflow of 50 c.f.s. cannot continue. To do so, it is contended, subjects the project to serious risks and is in contravention of the overall purpose of the structure and its proper, established regulation. Although I cannot wholeheartedly agree, I am not in a position to substitute my judgment for that of the managers of the facility. Particularly would I be remiss to do so when the evidence reveals that the structure is being managed in compliance with the established regulations and procedures and in furtherance of the congressional purposes expressed in the dam's authorization.

As previously mentioned, I am most cognizant of the problems faced by landowners along the James River with respect to the flooding of homes and prime agricultural land. It was because of this grave concern and because of the evidence suggesting that a temporary cessation of water releases from Pipestem Dam could be of great assistance in alleviating the flood conditions in South Dakota during the critical April-May planting season that I granted plaintiffs' temporary restraining order and its subsequent extension. I should add, however, that the order granted was not as requested by plaintiffs as I did not feel that the evidence, particularly with regard to the balancing of the interests and the possibility of irreparable harm, justified a complete closing of the dam.

The evidence does not support any further intervention by this court in the operation of the Pipestem Dam. After twenty days of operation under this court's restraining order, the possibility of irreparable harm and the balancing of the interests involved can no longer support this court's involvement in the operation of

Pipestem Dam. In order to justify the issuance of a preliminary injunction, the moving party has the burden of showing both a substantial probability of success at trial and irreparable injury absent such issuance. *Regents of University of Minnesota v. National Collegiate Athletic Association*, 560 F.2d 352, 365 (8th Cir. 1977), and *Planned Parenthood v. Citizens for Community Action*, 558 F.2d 861, 866 (8th Cir. 1977). In both respects, plaintiffs have failed to meet their burden of proof.

Moreover, this Court is not convinced that in balancing the possible harm plaintiffs may suffer against the possibility of harm to other interested parties, such as the North Dakota citizens in the Jamestown area, that further control of the Pipestem Dam can be justified. The preliminary injunction must therefore be denied. *Minnesota Bearing Co. v. White Motor Corp.*, 470 F.2d 1323, 1326 (8th Cir. 1973). See also Wright and Miller, Federal Practice and Procedure, Section 2948.

With respect to the necessity of showing a substantial probability of success at trial, plaintiffs concede that this Court's standard of review is limited to agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Environmental Defense Fund v. Corps of Engineers, United States Army*, 470 F.2d 289, 300 (8th Cir. 1972). Without such a showing this Court is not empowered to substitute its judgment for that of the agency. In this regard, see also 5 U.S.C. Section 706. The evidence presented to the court falls far short of such a showing.

The Corps has established regulations for the operation of Pipestem Dam. They have consistently operated in accordance with those regulations. They, in fact, have exercised their authorized discretion to restrict the flow from Pipestem Dam in an attempt to provide some flood control assistance for northern South Dakota. These facts will not support a finding of arbitrary and capricious actions by the Corps of Engineers. As much as I sympathize with the plight of many citizens represented by the plaintiffs, this Court cannot rescue them from the conditions imposed by nature by taking over the Corps' operation of Pipestem Dam. Under these circumstances, the law will not permit it.

It is therefore the opinion of the Court that the motion for a preliminary injunction is denied. The above shall constitute this Court's findings of fact and conclusions of law. Counsel for the defendants is directed to prepare an appropriate order.