In re OAHE CONSERVANCY SUB–DISTRICT, a Political Subdivision, of the State of South Dakota; and the James River Flood Control Association, a Non-Incorporated South Dakota Association, and the Tacoma Park Association, a South Dakota Corporation, Plaintiffs,

v.

Clifford L. ALEXANDER, Jr., Secretary of the Army, the Pentagon, Washington, D.C. 20310, Lieutenant General John W. Morris, Chief of Engineers, Department of the Army, Washington, D.C. 20314, Colonel William Ray, District Engineer, Omaha District, Corps of Engineers, 6014 U.S. Postoffice and Courthouse, Omaha, Nebraska 58102, Defendants,

State of North Dakota, Intervenor as Party Defendant.

No. 78–1006.

United States District Court, D. South Dakota, N. D.

July 25, 1980.

Tom P. May, Spokane, Wash., B. Elizabeth Ganje, Aberdeen, S.D., for Oahe Conservancy Sub-District.

Terry Pechota, U.S. Atty., Sioux Falls, S.D., for defendants Alexander and Morris.

Faye C. O'Connor, Asst. Dist. Counsel, Army Corps of Engineers, Omaha Dist., Omaha, Neb., for Corps of Engineers, defendant.

Michael A. Dwyer, Sp. Asst. Atty. Gen., North Dakota State Water Commission, Bismarck, N.D., for defendant-intervenor.

## MEMORANDUM OPINION

DONALD J. PORTER, District Judge.

### CASE SUMMARY

Plaintiffs brought this action for injunctive and declaratory relief relating to defendants' operation of the Jamestown and Pipestem dams in North Dakota. Plaintiffs' motion for preliminary injunction was denied by the Court in *Oahe Conservancy Sub-District v. Alexander*, 452 F.Supp. 714 (D.S.D.1978). The action was tried on the merits June 9, 10 and 11, 1980. The Court now concludes that it must reject plaintiffs' claim that defendants have in any way operated the dams in violation of law. The Court also overrules plaintiffs' contention that the current regulations for the dams were adopted contrary to the requirements of the Administrative Procedure Act, or that defendants have violated their own regulations. The Court determines, however, that defendants have violated 33 U.S.C. § 709 in failing to publish general regulations for the Pipestem Dam, and in that respect only, judgment will be entered for plaintiffs.

### FACTUAL BACKGROUND

The basic facts underlying this case were described at length in the previous reported opinion, and will only be briefly mentioned here. The James River begins in eastern North Dakota, and flows south, past the city of Jamestown, North Dakota, and eventually enters South Dakota. The two plaintiff associations are composed primarily of farmers who live along the banks of the James River as it flows through the northern South Dakota counties of Brown and Spink.

The two dams pertinent to this litigation are the Jamestown and Pipestem dams. Both are directly upstream from the city of Jamestown. The Jamestown Dam was constructed on the James River in 1953 by the Bureau of Reclamation (now the Water & Power Resource Service) and that agency controls the Jamestown Dam until the water level in the dam enters the flood zone level. At that point, jurisdiction is taken over by defendants, the Corps of Engineers. The Pipestem Dam was constructed in 1973 on Pipestem Creek, a tributary of the James River which enters the River just above the city of Jamestown. The Pipestem Dam is under the sole jurisdiction of the Corps of Engineers. Water released from the two dams commingles in the James River as it passes through the city of Jamestown.

As mentioned above, plaintiffs attack both the manner in which defendants operate the dams, and the validity of the written regulations adopted concerning dam operation. These issues will be considered separately.

### DISCUSSION

#### I

##### *Operation of the Dams*

 *Nuisance.* In their third claim for relief, plaintiffs apparently seek to bring a cause of action for common law nuisance against defendants for their operation of the dams. Plaintiffs allege that "defendants' continued operation of the Jamestown and Pipestem Reservoirs and Dams constitutes unlawful interference with the flow of the James River which has and will cause unnecessary flooding on plaintiffs' lands. . . ." Such a cause of action cannot be sustained. Plaintiffs overlook the unmistakable language of 33 U.S.C. § 702c, which states that "No liability *of any kind* shall attach to or rest upon the United States for any damages from or by floods or flood waters at any place. . . ." (Emphasis supplied) Plaintiffs seek to limit the scope

of this action by arguing that § 702c bars only monetary liability, and not the injunctive relief sought by this action. This Court does not so narrowly read the statute. *See, e. g.,* the definition of "liable" in Black's Law Dictionary (4th ed. 1968): "Bound or obligated in law or *equity.* . . ." (Emphasis supplied) As the case of *National Mfg. Co. v. United States,* 210 F.2d 263 (8th Cir. 1954), *cert. denied,* 347 U.S. 967, 74 S.Ct. 778, 98 L.Ed. 1108 (1954), put it,

. . . when Congress entered upon flood control on the great scale contemplated . . . it safeguarded the United States against liability of any kind for damage from or by flood or flood waters in the broadest and most emphatic language . . . there is no question of the power and right of Congress to keep the government entirely free from liability when floods occur, notwithstanding the great government works undertaken to minimize them.

210 F.2d at 270. *See also Burlison v. United States,* 627 F.2d 119 (8th Cir. 1980); *Lunsford v. United States,* 570 F.2d 221 (8th Cir. 1977). This policy would be frustrated by permitting private landowners to sue in nuisance to compel changes in the operations of government dams, even where it is claimed that flooding has resulted. This is not to hold that the actions of dam operators are completely unreachable by the judiciary, as shown by the discussion below, but this Court does rule that § 702c bars all common law tort actions against the United States arising from flood damages, whether the cause of action is grounded in law or equity. *See Hurley v. Kincaid,* 285 U.S. 95, 52 S.Ct. 267, 76 L.Ed. 637 (1932).

▬ *Claimed Violation of 33 U.S.C. § 701a.* In their second claim, plaintiffs cite the "Declaration of policy" at 33 U.S.C. § 701a that "the Federal Government should improve or participate in the improvement of navigable waters or their tributaries, including watersheds thereof, for flood-control purposes *if the benefits to whomsoever they may accrue are in excess of the estimated costs, and if the lives and social security of people are otherwise adversely affected.*" (Emphasis supplied)

Plaintiffs contend that they have a legal right under this statute to receive flood control benefits from these two dams, but that defendants have failed to formulate rules for the regulation of the dams for the maximum benefit possible for plaintiffs. This Court must find, however, that this general policy statement creates no rights which plaintiffs may vindicate in a lawsuit. The statement in *Cape Henry Bird Club v. Laird,* 359 F.Supp. 404 (W.D.Va.1973) is typical of cases considering this issue. ". . . because of the innumerable number of methods of deriving them, [benefit cost] ratios, computed under 33 U.S.C. § 701a, are not judicially reviewable . . ." 359 F.Supp. at 413. *See also Environmental Defense Fund v. Corps of Engineers,* 492 F.2d 1123 (5th Cir. 1974); *Environmental Defense Fund v. Froehlke,* 473 F.2d 346 (8th Cir. 1972); *Libby Rod & Gun Club v. Poteat,* 457 F.Supp. 1177 (D.Mont.1978); *Environmental Defense Fund v. T. V. A.,* 371 F.Supp. 1004 (E.D.Tenn.1973), *aff'd.* 492 F.2d 466 (6th Cir. 1974). As shown by the discussion below, flood control benefits from a dam essentially depend on there it is constructed. By authorizing the construction of these dams at their present site, Congress has resolved the benefit/cost ratio issue for these dams for all time, and the issue cannot be reviewed by this Court now. What is properly considered a cost or what should be treated as a benefit, is a matter of policy to be determined by the people through the legislative branch of government.

*Review under 5 U.S.C. § 706.* Even though the Court may be otherwise barred from an inquiry into defendant's operation of the dams, a limited review of defendant's actions is authorized by the Administrative Procedure Act. Several courts have noted that in spite of the language of 5 U.S.C. § 701(a)(2) that the judicial review provisions of the APA do not apply where agency action has been committed to agency discretion by law, a Court can still review agency actions under 5 U.S.C. § 706(2)(A) to determine whether the action was an abuse of that discretion. *Reece v. United States,* 455 F.2d 240 (9th Cir. 1972); *Littell v. Mor-*

*ton*, 445 F.2d 1207 (4th Cir. 1971); *Ajay Nutrition Foods, Inc. v. Food and Drug Administration*, 378 F.Supp. 210 (D.N.J. 1974), *aff'd*, 513 F.2d 625 (3rd Cir. 1975).

 This standard of review is an extraordinarily limited one. A court

must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. . . . Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

*Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). There must be a " 'rational connection between the facts found and the choice made' . . . [while a court] may not supply a reasoned basis for the agency's action that the agency itself has not given . . . [a court] will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 285–6, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974).

The basis of plaintiff's case is their allegation that defendants' operation of the Jamestown and Pipestem dams causes an increase in the duration of high river stages in the James River in Brown and Spink Counties in South Dakota. This, plaintiffs claim, aggravates wet field conditions, delays planting, prevents fall or spring preparation, destroys growing crops, prevents harvest, damages fences and dikes and prevents their repair, kills trees, causes bank slump, creates salting problems, and aggravates weed problems. Plaintiffs argue further that defendants have allegedly failed to take into consideration the claimed fact that the James River channel in northern South Dakota has become increasingly restricted from a variety of causes, thus intensifying the high water problems. Plaintiffs contend that defendants' alleged refusal to operate the two dams so as to avoid this damage, and defendants' alleged failure to produce a reasonable basis upon which their operations can be justified, constitutes arbitrary and capricious action.

The method of operation of the ·dams is set forth in two Reservoir Regulation Manuals, one for each dam, with the precise releases recorded in terse Reservoir Regulation Orders, which usually contain a brief one or two line explanation of the action taken. All parties also offered the testimony of certain of defendants' employees to supplement this record.

From this evidence it is obvious that defendants do indeed operate the dams first and foremost for the area immediately below the dams, the city of Jamestown. Their operating procedure, known as "Method A" flood control, "is based on the concept of reducing downstream damaging stages as much as possible during each flood with the currently available storage space." The Corps gauges their operations, at least in the early part of the. year, to. release water at a rate sufficient to keep the flood storage areas open to receive additional runoff. This is to avoid the possibility that an unexpectedly heavy storm could completely fill the dams and cause uncontrolled releases over the emergency spillways, possibly causing great damage to the city of Jamestown.[1] On the other hand, the releases from the dams must also be kept low enough so that the channel capacity of the James River as it moves through the city of Jamestown and the area immediately downstream is not exceeded. If the flood control pool begins to fill, defendants start to discharge water up to 450 cfs (cubic feet per second) the channel capacity in much of rural North Dakota downstream from the city of Jamestown.[2] If the flood storage

---

1. Once full, the flood control pools of the two dams take an extremely long period of time to evacuate when releases are made at the rate of 400 cfs.

2. Even at 450 cfs, there is evidence of some minor flooding in the city of Jamestown.

Plaintiffs claim defendants have acted arbitrarily in failing to prohibit construction in the flood plain of the James River but point to no law giving defendants power to prevent such encroachment.

pool fills beyond a certain point, releases are then increased up to 1800 cfs, which is considered as the maximum channel capacity through the city of Jamestown. Even after the spring and summer season, evacuation of the dams must continue at a relatively high rate, if necessary, before the onset of winter, when ice could severely restrict channel capacity. Otherwise, the Manuals indicate, the flood control pools in the dams would not be ready to receive runoff from the "wet" season the following year. The natural effect of this, in some years, is to continue relatively high flows in the James River beyond the time that the river would normally be high, while the Corps seeks to evacuate enough space in the dams to avoid the risks of overtopping. Defendants concede that some years such operating procedure is a contributing factor to the high flows which appear to cause the damage of which plaintiffs complain. But it is also clear that some years the flows in the James River in South Dakota have very little relation to discharges from the dams.

In 1978, for example, defendants' evidence showed that discharges from the dams never exceeded 150 cfs. Yet, at Columbia, Brown County, South Dakota, near the state boundary, the flow at one point became 1200 cfs, and later was 600 cfs. In Ashton, Spink County, South Dakota, further south, there was also a much greater volume of water than there was at any time directly beneath the dams.

This data is indicative of the difficulties defendants have in planning for South Dakota's benefit. It is approximately one hundred twenty river miles from the dams to the state line, and about two hundred river miles more to Ashton, South Dakota. As the James River nears South Dakota, the slope of the river becomes very shallow, and travel time becomes slow. Normally, it appears that it may take from two to three weeks for water to reach Columbia from Jamestown, and from four to seven weeks for water to travel from Jamestown to Ashton, though the time is apparently somewhat speeded when the river is in flood stage. In addition, there are wildlife refuges in the river between Jamestown and northern South Dakota which tend to retard the flow, particularly during times of high flows. There are also natural and man-made obstructions in the river which have the effect of slowing the river's speed. The two dams together control only about 33–40% of the drainage basin above Columbia, and just 26% of the basin above Ashton; thus, as the discussion of the 1978 flows above indicates, there are many sources of water which affect the flow in South Dakota over which the dams have no control.

All this taken together tends to support defendants' assertion that their ability to operate the dams for plaintiffs' benefit is rather limited. Certainly, nothing in the record convincingly refutes the statement of Richard Behrens, the overseer of the two dams, made at the hearing on plaintiffs' application for a preliminary injunction in this matter:

The closer you are below a dam, the more you can expect from it, flood control-wise. The farther away you get from a dam, the less you can expect from it. If you're two or three or four days away from a dam, or one day or a few hours, you can expect something from it, but when you're three weeks or a month away, you can't expect much from it, and this is the case here.

This Court cannot accept an argument that the dams were built solely for the city of Jamestown and the land along the river just to the North Dakota state line. It is clear, however, that the city of Jamestown has to be considered the primary beneficiary of the dams, if for no other reason than that Congress authorized construction of the dams immediately upstream from the city. Thus, it can hardly be arbitrary, capricious, or an abuse of discretion for defendants to design their plans primarily for the areas they have the best ability to benefit, rather than areas at a distance, where the benefits would be uncertain.

At the same time, defendants could not permissibly operate the dams heedless of the interests of South Dakota, or regulate the dams to the detriment of South Dakota when that detriment could reasonably be

avoided. But there is no evidence that such has ever been the case.

■ The evidence showed that defendants are aware of the channel capacity in South Dakota, as well as that in North Dakota, keep track of the river stages in South Dakota, and study precipitation reports and snow depth to gain an awareness of what will happen in South Dakota during the course of a year. On several occasions, defendants have in fact curtailed releases to minimize damage in South Dakota. (Even if it is not now the sort of benefit that plaintiffs want, it appears that there has been a general reduction in the peaks of floods along the James River in northern South Dakota as a result of the dam's regulation by defendants.) It is clear that in *some* years, weather conditions oblige defendants to make releases that, while protecting the city of Jamestown, contribute to damage in South Dakota. But, as Behrens, who schedules flood control releases from the dams stated in his testimony, defendants "consider all the conditions, the . . . purpose of the project and the time of the year, pool levels and if [defendants] feel [they] can, [they] have in the past and [they] will in the future, try to help out."[3] Such evidence will not support a finding of arbitrariness, capriciousness or abuse of discretion.

Plaintiffs have suggested other procedures by which these dams could be operated. It is possible that the dams could be better regulated, and that defendants' plan of operation is not the best that could possibly be designed. But under the standard of review to which this Court is limited, such *possibilities* have no place. A court cannot substitute its judgment for that of the agency. The standard is only whether there is a "rational connection between the facts found and the choice made." Taking all the evidence into consideration, this Court finds that rational connection exists here. Plaintiffs have made no showing that defendants' decision to regulate the dams in this manner was not based on a consideration of the relevant factors, or that defendants made a clear error of judgment. Plaintiffs' attack on defendants' operation has therefore failed of its burden of proof, and defendants must prevail as to that claim.[4]

## II

*Noncompliance with the A.P.A. in Promulgating Dam Regulations.*

The remainder of plaintiffs' claims deal with defendants' alleged failure: (1) to comply with the direction of 33 U.S.C. § 709 to promulgate regulations for the two dams; (2) to comply with the A.P.A. 5 U.S.C. § 551 et seq., in formulating the regulations that have been promulgated; and (3) to observe the regulations that have been promulgated.

*Claimed Violations of 33 U.S.C. § 709 and 5 U.S.C. § 552.* The ultimate basis of these claims is the language of 33 U.S.C. § 709:

> [Hereafter,] it shall be the duty of the Secretary of [the Army] to prescribe regulations for the use of storage allocated for flood control or navigation at all reservoirs constructed wholly or in part with Federal funds provided on the basis of such purposes, and the operation of any such project shall be in accordance with such regulations.

---

**3.** This is allowed for by a paragraph contained in the Reservoir Regulation Manuals for both dams:

> Temporary deviations from the normal flood control regulation plan may be made if conditions at the time are such that improved flood control will result. A factor for consideration in deviating from the normal plan is the occurrence of substantial runoff downstream from Jamestown. At such time release reductions may be feasible in order to reduce damages downstream from the dam.

Two Pipestem Reservoir Regulation Orders, dated June 19, 1979, and July 9, 1979, make express mention of reducing releases to alleviate high water problems between Columbia and Ashton.

**4.** This Court has no problem in finding, on the basis of the above, that defendants have acted within the scope of their authority, and that their choices can reasonably be said to be within the range of choices available to them, should that standard of review also apply to this case. *Overton Park*, 401 U.S. at 415–16, 91 S.Ct. at 823–824.

Regulations have been published with respect to the Jamestown Dam, those currently in effect being found at 33 C.F.R. § 208.11. No regulations have ever been published with respect to the Pipestem Dam. Defendants' position on why it was not necessary to issue regulations for pipestem is somewhat obscure. Though defendants have avoided the precise issue in their most recent briefs, defendants' position at the hearing for Temporary Restraining Order in this case was that § 709 required regulations only for those dams with flood storage that were built by an agency other than the Corps of Engineers. Because the Jamestown Dam was a Bureau of Reclamation (now Water & Power Resource Service) project, with the Corps taking over when flood storage is reached, defendants issued regulations. But because the Pipestem Dam is solely a Corps of Engineers project, defendants argued, regulations were unnecessary. Defendants present no statutory or case law authority in support of this contention, and this Court has found none. Section 709 states regulations shall be prescribed for *all* reservoirs constructed with federal funds for the purpose of flood control. The evidence has established decisively that flood control is the purpose of the Pipestem Dam; this Court can find no exemption from § 709 for Pipestem just because it was built by the Corps of Engineers alone.

■ Defendants have also argued that they do have regulations for Pipestem, contained in that dam's Reservoir Regulation Manual, but that these are unpublished because § 709 does not explicitly require publication. This argument is unsupportable. The pertinent statute, 5 U.S.C. § 552(a), explicitly states that

"(1) Each agency shall separately state and currently publish . . .

(D) substantive rules of general applicability adopted as authorized by law . . . ."

This Court can find no way to hold that the § 709 "regulations" do not fall within the meaning of this statute. Considering the broad, far-reaching effects that the operation of the flood-control portions of dams can have, as demonstrated by the earlier portion of this opinion, it would be unreasonable to say that regulations covering such operations are not "rules of general applicability." Further, if the regulations required by § 709 were not meant to be published, then why have defendants published 33 C.F.R. § 208.11 to carry out their responsibilities under § 709 with respect to the Jamestown and other dams? It is clear that the failure of § 709 to explicitly mention publication is meaningless: 5 U.S.C. § 552(a)(1)(D)'s directive is not dependent on whether or not the statute authorizing the adoption of the rule includes a requirement that the rule be published. *See* 5 U.S.C. § 552(b)(3), which gives an exemption to matters *"specifically* exempted from disclosure by statute . . . ." (Emphasis supplied.) The Court must find, therefore, that defendants have violated 33 U.S.C. § 709 and 5 U.S.C. § 552(a)(1)(D) by failing to publish regulations as contemplated by § 709 with respect to the Pipestem Dam.

■ This is not to suggest, however, that the Court accepts plaintiffs' contention that the Reservoir Regulation Manuals themselves must be published in the Federal Register. Section 552(a)(1)(D) requires the publication of "substantive rules of *general* applicability. . . ." (Emphasis supplied) This is exactly what the published regulations of the Jamestown Dam, which also encompass eighty-seven other dams, purport to be: "This regulation prescribes the responsibilities and general procedures for regulating reservoir projects capable of regulation for flood control . . . and the use of storage allocated for such purposes. . . ." 33 C.F.R. § 208.11(a). The authorizing statute, 33 U.S.C. § 709, does not say how specific the regulations adopted must be, and *no reason appears* why such general regulations as appear at 33 C.F.R. § 208.11 are not sufficient for § 709's purpose.

On the other hand, the Manuals devote considerable length to technical discussions of the dam structures themselves, the James River watershed, climate and stream flow, with many complex illustrative plates and tables for the purpose of forecasting

conditions and how the dam is to be operated in response thereto. Looking at the Manuals as a whole, this Court must find that the Manuals have to be considered as mechanical *instructions* to the persons responsible for making the decisions for the physical operation of the dam, rather than some sort of "substantive rules of general applicability." *See St. Elizabeth Hospital v. United States*, 558 F.2d 8, 12–13 (Ct.Cl. 1977); *St. Francis Memorial Hospital v. Weinberger*, 413 F.Supp. 323, 328 (D.N.D. Cal.1975); *Commonwealth of Pennsylvania v. United States*, 361 F.Supp. 208, 221 (D.M. D.Pa.1973) (three-judge court), *aff'd*. 414 U.S. 1017, 94 S.Ct. 440, 38 L.Ed.2d 310 (1973). Because it cannot be said that decisions taken under the Manuals have no effect on the public, disclosure of the Manuals is necessary. But the disclosure requirements of 5 U.S.C. § 552 are met by compliance with § 552(a)(2), rather than full publication:

> "Each agency, in accordance with published rules, shall make available for public inspection and copying . . .
>
> > (c) administrative staff manuals and *instructions to staff* that affect a member of the public . . . ." (Emphasis supplied)

*See*, generally, *Cox v. United States Dept. of Justice*, 576 F.2d 1302 (8th Cir. 1978). It appears that this procedure is provided for · in the context of this case by 33 C.F.R. § 208.11(d)(8): "The water control manual [of a particular dam] will be made available for examination by the general public upon request at the appropriate office of the Corps of Engineers, project owner or designated operating agency."

It would place an excessively heavy burden on defendants to require them to publish each of their bulky manuals for each of their multitude of dams, when such an obligation does not seem required by the A.P.A. The availability of the manuals for inspection and copying, under § 552, provides sufficient protection to the public interest.

■ *Claimed Violation of 5 U.S.C. § 553.* Similar reasoning leads this Court to reject plaintiffs' claims that the undisputed failure of defendants to follow the notice and hearing procedure of 5 U.S.C. § 553 in adopting the Reservoir Regulation Manuals or 33 C.F.R. § 208.11 render the Manuals and regulations void. Defendants argue that such procedure was not required because of the "public property" exemption to general notice and hearing requirements, § 553(a)(2),[5] and the Court finds that it must agree.

A number of cases have held that the electric power generated at a federal power project is public property within the meaning of the statute. *Associated Elec. Coop. Inc. v. Morton*, 507 F.2d 1167 (D.C.Cir.1974), *cert. denied*, 423 U.S. 830, 96 S.Ct. 49, 46 L.Ed.2d 47 (1975); *City of Santa Clara v. Kleppe*, 418 F.Supp. 1243 (N.D.Cal.1976), *aff'd in part*, 572 F.2d 660 (9th Cir. 1978), *cert. denied*, 439 U.S. 859, 99 S.Ct. 176, 58 L.Ed.2d 167 (1978); *Northern California Power Agency v. Morton*, 396 F.Supp. 1187 (D.D.C.1975), *aff'd* 539 F.2d 243 (D.C.Cir. 1976). The legislative rationale for the exemption is that

> the principal consideration in most such cases relate to *mechanics and interpretations or policy*, and it is deemed wise to encourage and facilitate the issuance of rules by dispensing with all mandatory procedural requirements . . . The exceptions . . . confer a complete discretion upon agencies to decide what, if any, public rulemaking procedures they will adopt in a given situation . . . .

S.Rep.No.752, 79th Cong., 1st Sess., at 199 (1945), cited at *City of Santa Clara v. Andrus*, 572 F.2d 660, 674 n. 8 (9th Cir. 1978), *cert. denied*, 439 U.S. 859, 99 S.Ct. 176, 58 L.Ed.2d 167 (1978) (Emphasis supplied). Plaintiffs attempt to limit the exemption to only those rules which involve the *distribution* of property by the United States, characterizing the flood control operation of these dams as a governmental function.

---

**5.** This section applies, according to the provisions thereof, except to the extent that there is involved . . .

(2) a matter relating to agency management or personnel or to public property, loans, grants, benefits or contracts.

Nothing in the statute or the cases gives much support to this distinction, and in this Court's view, if the electricity generated by a dam is public property, the mechanical operation of the dam itself is also "a matter relating to . . . public property." Regulations dealing with dam operation for flood control therefore need not be adopted in compliance with § 553.[6]

 *Claimed Violations of 33 C.F.R. § 208.11.* Finally, plaintiffs contend that defendants have not complied with the regulations they published with respect to the Jamestown Dam, at 33 C.F.R. § 208.11. These regulations specify the procedure for the formulation of a "water control plan and manual", including the sponsorship of meetings to "fully apprise the general public of the water control plan." Unfortunately for plaintiffs' position, however, the regulations make it clear that such procedures are to be completed by the time the dam first becomes operational. § 208.-11(d)(1), (4) & (8). This regulation was issued in 1978 while the Jamestown Dam was constructed in 1953, and the Pipestem Dam was constructed in 1973. No contention has been advanced, other than those rejected above, that the Manuals were in any way written in violation of any law in effect at the time of their writing, and this Court finds no reason to apply that portion of § 208.11 retroactively to the operations of dams built before the regulations were adopted. The " 'first rule of construction is that [rules] must be considered as addressed to the future, not to the past . . . [and] a retrospective operation will not be given to a [rule] which interferes with antecedent rights . . . unless such be "the unequivocal and inflexible import of the terms . . . ." ' " *Greene v. United States*, 376 U.S. 149, 160, 84 S.Ct. 615, 621, 11 L.Ed.2d 576 (1964).

The other section of § 208.11 of which plaintiffs complain in this regard is one that calls for the preparation of a "water control agreement." The application of this section is less clear, since it contains no language indicating when the agreement is to be written, but the context suggests that it is to accompany the preparation of the water control plan and manual, since a copy of the agreement is to be included as an exhibit in the manual. In any event, the documents already written seem to substantially satisfy the requirements of § 208.11. *See Arlington Coalition of Transportation v. Volpe*, 458 F.2d 1323, 1339 n. 10 (4th Cir. 1972), *cert. denied*, 409 U.S. 1000, 93 S.Ct. 312, 34 L.Ed.2d 261 (1972).

Defendants appear to concede that § 208.-11 procedures will apply prospectively to revisions in their operating documents. This Court agrees, and notes especially § 208.11(d)(8), with its requirement that public "notice shall also be used when appropriate to inform the public of modifications in the water control plan." The generalized requirements for flood control at § 208.11(d)(9) would also seem to apply prospectively. But the Court finds no basis in the record before it to find that defendants have in any way violated these sections, or the provision in § 208.11(d)(10) enabling defendants to revise their operational plans "to reflect changed conditions."

In summary, this Court finds that plaintiffs' action succeeds only at one point, defendants' failure to publish regulations for the Pipestem Dam pursuant to 33 U.S.C. § 709. Defendants shall issue such regulations for that dam. In all other respects judgment will be entered for defendants. This memorandum opinion constitutes the findings of fact and conclusions of law in this action.

───

**6.** It should be noted this "public property" exemption to § 553 has no bearing on disclosure requirements under § 552. *See, e. g., Northern*

*California Power Agency v. Morton*, 396 F.Supp. at 1191 n. 6.